RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHARA JENKINS, individually and as legal guardian
of Shanell Ratcliff (06-4550); BRENDA MULKEY,
individually and as legal guardian of Charles
Littlejohn (06-4551),
                              *Plaintiffs-Appellants,*

> Nos. 06-4550/4551

*v.*

ROCK HILL LOCAL SCHOOL DISTRICT and LLOYD
EVANS, individually and in his official capacity as
Superintendent of Rock Hill Local School District,
                              *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 04-00180; 04-00269—Susan J. Dlott, District Judge.

Argued: December 5, 2007

Decided and Filed: January 17, 2008

Before: DAUGHTREY and COLE, Circuit Judges; COLLIER, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Michael Garth Moore, LAW OFFICE OF MICHAEL MOORE, Columbus, Ohio, for
Appellants. R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellees.
**ON BRIEF:** Michael Garth Moore, LAW OFFICE OF MICHAEL MOORE, Columbus, Ohio, for
Appellants. R. Gary Winters, Ian R. Smith, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio,
for Appellees.

---

## OPINION

---

CURTIS L. COLLIER, Chief District Judge. Plaintiffs Shara Jenkins ("Jenkins") and
Brenda Mulkey ("Mulkey") filed this consolidated appeal challenging the district court's grant of
summary judgment to defendants Lloyd Evans ("Evans") and the Rock Hill School Board ("School

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee,
sitting by designation.

Board") on their First Amendment retaliation and privacy claims. In analyzing the retaliation claims, the district court incorrectly limited constitutionally protected activities to matters of public concern. However, because the district court reached the correct decision on all claims except Jenkins's retaliation claim against Evans, we REVERSE the district court's decision on that claim and AFFIRM its decision on all others.

## I.     RELEVANT FACTS AND PROCEDURAL HISTORY

### A.     Jenkins and Her Daughter, Shanell

This case stems from a dispute between Jenkins and school officials over the treatment of Jenkins's daughter, Shanell. Shanell was enrolled in first grade at Rock Hill Elementary School ("Rock Hill") in March 2000. That month, Shanell was diagnosed with diabetes, and Jenkins made arrangements with the school nurse, Marsha Wagner ("Wagner"), for Wagner and other school personnel to assist Shanell with her diabetes treatment.

There were no problems until Shanell started second grade in the 2000-2001 school year. Jenkins again arranged with Wagner for school personnel to assist Shanell. However, there was an apparent misunderstanding between Jenkins and Wagner over whether Wagner would administer an insulin shot if she received proper written authorization from Jenkins and Shanell's doctor. This confusion led Jenkins to believe Rock Hill was being uncooperative in caring for Shanell.

Because Rock Hill would not administer insulin shots, Jenkins contacted Evans, the school superintendent, on October 29, 2001. In her affidavit, Jenkins alleges Evans told her the school was not responsible for Shanell's medical care and suggested she enroll Shanell in a different school. Jenkins then contacted the School Board on November 19 and the Ohio Coalition for Children with Disabilities on November 26.

The following day, November 27, 2001, Jenkins alleges Evans called her and told her Shanell could not come back to school. This prompted Jenkins to contact the U.S. Department of Education's Office of Civil Rights, the Ohio Department of Education, a county commissioner, and members of the School Board.

After Shanell missed over a week of classes, Evans relented and allowed Shanell to return to school on December 6. The next day, Jenkins claims school personnel barred her from going to Shanell's classroom, while other non-employees freely walked through the building as Jenkins normally did. Defendants respond that Jenkins was stopped at the front office because she was required to comply with the general policy of signing in before seeing her daughter during school hours. Jenkins claims that when she confronted Evans about this incident and the school's role in caring for Shanell, Evans threatened to involve the Lawrence County Department of Job and Family Services ("Children Services") in the matter. "Ms. Jenkins," he allegedly explained, "you contacted the Office of Civil Rights and got an investigation started, so I figured I'd start one of my own."

The next week, on December 13, 2001, the Ironton Tribune newspaper printed a letter to the editor written by Jenkins:

> I have a 7-year-old daughter who is diabetic and has attended Rock Hill No. 2 school for three years. I received a phone call from the superintendent Nov. 27 and was told I couldn't bring my daughter back to school. I was told she wasn't enrolled there anymore.
>
> The school took it upon themselves to withdraw her without my permission and said that I was the one who withdrew her. We tried going to the school and got escorted

out by a teacher. I made contacts with the state and got her back in school after she missed seven days.

Now, we are being treated differently, just because I'm fighting for my daughter's rights. There's only one teacher in the school willing to take responsibility for my daughter's health issues. This goes to show you how much "teachers" care about your children.

She also filed a complaint with the U.S. Department of Education, which the agency received on December 17.

On December 19, 2001, a call was placed from the Rock Hill principal's office to Children Services. In that call, Wagner provided information about Jenkins and Shanell. Children Services filed a court complaint against Jenkins in January 2002, but the charges were dropped as unsubstantiated in May 2002.

When Jenkins accused Evans of calling Children Services, she contends that he responded, "I told you I was going to involve Children Services . . . I don't like to be pushed around. I don't take that too lightly." When she told Evans their disputes would have to be settled in court, he suggested she would be wasting her time. "I have a lot more pull than you do, and there's no attorney gonna stand up to me, because they know they can't win," she recounts him saying.

Also in January 2002, Shanell's doctor recommended she be home-schooled, and Shanell stopped attending school. Rock Hill initially provided a tutor but that person stopped tutoring Shanell for reasons unknown to her mother. Jenkins repeatedly requested Evans provide a tutor for Shanell but Evans allegedly said he could not find anyone willing to tutor her. Without a tutor, Shanell did not receive her education the last three months of the school year. The next school year, she transferred to another school district.

### B.     Mulkey and Her Son, Charles

Mulkey enrolled her son Charles in Rock Hill in January 2003. Charles had diabetes, so school nurse Wagner checked his blood sugar regularly. Mulkey received frequent calls from Wagner telling her to pick Charles up from school because his blood sugar was high or he was not feeling well. Mulkey felt that some of those calls were unnecessary. She complained about the calls to Wagner. She then brought her concerns to Evans, who disagreed with her concerns. Evans also suggested the possibility of home-schooling, which Mulkey declined because Charles's doctor recommended he attend school with other kids.

On March 18, 2003, Charles was sick so Wagner tried to contact Mulkey, but Mulkey's phone was disconnected. In addition, Wagner was running low on medical supplies that Mulkey was supposed to supply for Charles. Wagner, after consulting with the school principal, called Children Services to report possible child neglect. A Children Services investigator interviewed her, causing her no expense or hardship, and then closed the case.

Two weeks after the Children Services call, on April 4, 2003, Mulkey moved to her father's property in another school district and enrolled Charles in that district.

## II.     STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment de novo. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must construe the facts and draw all inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III. DISCUSSION

Plaintiffs brought their claims for violations of the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, which allows a plaintiff to vindicate the deprivation of constitutional rights by a defendant acting under color of law. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).

### A. Retaliation

Plaintiffs allege they were retaliated against in violation of the First Amendment. There are three elements to a retaliation claim:

(1) the plaintiff was engaged in a constitutionally protected activity;
(2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and
(3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). If the plaintiff meets this burden, the burden of production shifts to the defendant, *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc), but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment. *Id.*

In granting summary judgment to Defendants, the district court incorrectly held that Jenkins's and Mulkey's speech was not constitutionally protected because it did not touch upon a matter of public concern. The public concern test originated in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983), in which the Supreme Court held the First Amendment protects from retaliation government employees who speak on matters of public concern.[1] 461 U.S. at 147. Following its rationale in *Pickering*, the Court in *Connick* sought to balance the interests of government employees, as citizens, "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 142 (citing *Pickering*, 391 U.S. at 568). To achieve this balance, the Court held the speech of government employees is constitutionally protected if it touches upon a matter of public concern. *Connick* was expressly limited to government employees and based solely on the need to balance the free speech rights of government employees with the government's needs as an employer. *See id.* at 154*; Thaddeus*, 175 F.3d at 390 ("The story of the public concern limitation is a story about the free speech of public employees.").

The Supreme Court has used the public concern test in situations analogous to public employment, where free speech rights must be balanced against the need to effectively manage a governmental entity. *See Tenn. Secondary Sch. Ath. Ass'n v. Brentwood Acad.*, 127 S. Ct. 2489,

---

[1] In fact, the public concern test actually expanded the free speech rights of public employees. *See Garcetti v. Ceballos*, 126 S. Ct. 1951, 1957 (2006) (noting that *Pickering* and *Connick* changed the dogma that public employees surrender all their First Amendment rights by reason of their employment); *Rutan v. Republican Party*, 497 U.S. 62, 95 (1990) ("Private citizens cannot be punished for speech of merely private concern, but government employees can be fired for that reason."); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156-57 (10th Cir. 2007) ("The public concern test was meant to form a sphere of protected activity for public employees, not a constraining noose around the speech of private citizens.").

2495 (2007) (coaches voluntarily participating in an athletic league); *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996) (government contractors).  Courts have made other similar extensions of the public concern test.  *Blackburn v. City of Marshall*, 42 F.3d 925, 932-34 (5th Cir. 1995) (describing cases involving doctors suing public hospitals over staff privileges and licensees suing government agencies, but declining to use public concern test in context of towing company owner who sued police official).

Beyond those limited extensions, applying "the public concern test outside the public employment setting would require us to rend it from its animating rationale and original context." *Van Deelen*, 497 F.3d at 1156-57; *see also Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004) ("To expand this public concern limitation into the broader context of all citizen speech would wrench it from its original rationale and curtail a significant body of free expression that has traditionally been fully protected under the First Amendment."); *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir. 2003); *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000); *Vickery v. Jones*, 100 F.3d 1334, 1346 n.1 (7th Cir. 1996); *United States v. Reyes*, 87 F.3d 676, 680 (5th Cir. 1996).

This circuit has likewise recognized the limited nature of the public concern test, in a case that we find dispositive here.  *Gable v. Lewis*, 201 F.3d 769 (6th Cir. 2000).  In *Gable*, the plaintiff alleged a police officer retaliated against her in violation of her First Amendment right to petition the government for a redress of grievances.  201 F.3d at 770.  The plaintiff won a jury trial, and the defendant appealed, arguing–among other issues–that the public concern test should have applied. The Sixth Circuit rejected the defendant's argument, holding that the public concern test is not applicable to petitioning activity outside the public employee context.  *Id.* at 771-72.[2]  The Court noted that *Connick* created the public concern test because government agencies need the ability to maintain order in their workplaces, which was inapplicable to the situation of a private individual petitioning the government for the redress of grievances.  *Id.*  Likewise, the reason does not apply in the context of parents criticizing school officials.  In addition, the Court noted that "the petition clause itself is not generally limited to matters of 'public concern' as described in the *Connick* case but includes the petitioner's private business interests."  *Id.*  Likewise, the Supreme Court has held that private speech is protected just like speech on public matters.  *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 223 (1967); *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

It is logical to extend *Gable*'s holding from petitioning to all speech because those rights are "inseparable."  *McDonald v. Smith*, 472 U.S. 479, 485 (1985) (The right to petition "was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble . . . These First Amendment rights are inseparable."); *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances.  All these, though not identical, are inseparable.").

Defendants cite four cases, all from outside this circuit, for their argument the public concern test applies when parents of school children criticize school officials.  Three of those cases are

---

[2] Defendants argue *Gable* has been implicitly overruled by *Jones v. Union County*, 296 F.3d 417, 426 (6th Cir. 2002).  The *Jones* panel could not have overruled the *Gable* panel.  6 Cir. R. 206(c); *United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997) ("[O]ne panel cannot overrule a prior panel's published decision.").  *Jones* states, without any discussion, "actions under the Petition Clause are limited to matters of public concern."  This quote, which was one of two alternative grounds for the Court's holding, was taken from *Valot v. Southeast Local School District Board of Education*, 107 F.3d 1220, 1226 (6th Cir. 1997), which is a public employment case.  For that proposition, *Valot* cites six cases from various circuits, all of which are in the public employment context.  The cases merely show that the public concern test applies to petitioning activity for public employees.

district court decisions that adopt, without analysis or explanation, the public concern test for parents criticizing school officials. The fourth case is *Landstrom v. Illinois Department of Children & Family Services*, 892 F.2d 670, 679 (7th Cir. 1990), in which the Seventh Circuit did not discuss the issue but, instead, merely stated it agreed with the lower court's analysis. The lower court had relied on *Pickering* and *Connick* to guide its opinion as to what constitutes an exercise of First Amendment rights, and determined parental criticism of school officials must touch upon a public concern to constitute the exercise of First Amendment rights. *Landstrom v. Illinois Dep't of Children & Family Services*, 699 F. Supp. 1270, 1278 n.17 & n.18 (N.D. Ill. 1988). However, as noted above, *Pickering* and *Connick* concern the exercise of First Amendment rights only by public employees. Because public employees lack free speech rights in the context of their employment, those cases ensure public employees can speak on matters of public concern. It seems apparent to us that the district court in *Landstrom* fell into the same error as the district court in this case. We respectfully decline to follow the Seventh Circuit's mistaken analysis.

Nevertheless, Defendants argue the public concern test is necessary to prevent frequent disputes between parents and school officials from becoming First Amendment lawsuits. But that purpose is served by the other two elements of a First Amendment retaliation claim. The element at issue here, constitutionally protected activity, cannot be so limited. Essentially, Defendants' contention is that parental speech about school officials is not constitutionally protected if the speech is not about matters of public concern. Such a contention is clearly wrong. Speech is generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words, *R. A. V. v. St. Paul*, 505 U.S. 377, 382-83 (1992), none of which is applicable here. Defendants have not pointed to any case from the Supreme Court or this Court that parents criticizing school officials is off-limits when the speech is not about matters of public concern. Rather, the right to criticize public officials is clearly protected by the First Amendment. *Bloch*, 156 F.3d at 678 (citing *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is the central meaning of the First Amendment.")).

Had the district court applied the proper definition of constitutionally protected activity, the Court would have recognized both Jenkins and Mulkey satisfy the first element of a prima facie First Amendment retaliation claim. Jenkins complained to Evans, wrote a letter to a newspaper, and contacted government officials and agencies; all these activities are constitutionally protected speech. Mulkey complained to Wagner and Evans, which is also constitutionally protected speech.[3]

In Jenkins's case, the district court did not reach the remaining two elements of a prima facie case, but it is nevertheless evident she satisfies them. As to the second element, a jury could conclude Evans's alleged actions, dismissing Shanell from school, being involved in making a false report to Children Services, and refusing to provide home-school education through the services of a tutor, would chill a person of ordinary firmness from engaging in speech. Jenkins also satisfies the third element because Evans allegedly admitted that Jenkins's complaints prompted him to be involved in reporting her to Children Services. *See* Fed. R. Civ. P. 56(c) (nothing that on a motion for summary judgment, we view all facts in favor of Jenkins). Therefore, the district court erred in granting summary judgment to Evans on Jenkins's retaliation claim.

In Mulkey's case, the district court noted there is "no evidence of any retaliation in this case." Mulkey did not challenge this determination on appeal, and there is no proof that Evans took adverse action against Mulkey. Instead, the evidence establishes Wagner called Children Services

---

[3] Because Jenkins and Mulkey are also pursuing claims on behalf of Shanell and Charles, the two children are also plaintiffs. Neither child presents a prima facie case because there is no evidence either engaged in any constitutionally protected speech, so the district court properly granted summary judgment on the claims by Shanell and Charles.

because she could not contact Mulkey and Mulkey had not provided necessary medical supplies for Charles. Accordingly, the district court did not err in granting summary judgment to Evans on Mulkey's retaliation claim.

The district court also did not err in granting summary judgment to the School Board on both Jenkins's and Mulkey's claims because there is no respondeat superior liability in actions under § 1983, and there is no evidence a government custom or policy led to any adverse action against Plaintiffs. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006).

## B.    Invasion of Privacy

Plaintiffs also allege violations of their right to privacy under the First Amendment. Although they brought these claims under the First Amendment, there is no indication or argument supporting a privacy violation based on the First Amendment. *Compare with NAACP v. Alabama*, 357 U.S. 449, 462 (privacy in associations protected by First Amendment), *Perry v. McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000) (substantive due process claim based on fundamental right of freedom of expression).

Instead the parties presented arguments relying on the substantive due process clause of the Fourteenth Amendment. The basis for Plaintiffs' arguments is that Defendants caused Wagner to falsely report to Children Services that Shanell and Charles were being medically neglected.[4]

As a preliminary matter, as discussed previously, there is no evidence Evans caused Wagner to make a false report about Charles, nor is there evidence the School Board, through an official or unofficial policy or custom, was involved in reporting either Shanell or Charles. Thus, assuming *arguendo* there was a privacy violation committed, the only possible claim is by Jenkins against Evans, who may be liable because there is evidence he proximately caused Wagner to make the false report about Shanell. *See Cameron v. Pontiac*, 813 F.2d 782, 786 (6th Cir. 1987); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000) ("An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights.") (citing *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999)).

The Fourteenth Amendment guarantees "due process of law" for any deprivation of "life, liberty, or property." U.S. Const. amend XIV § 1. This guarantee includes both procedural and substantive components. The substantive component incorporates most guarantees of the Bill of Rights, and it also protects other "fundamental rights and liberties which are, objectively deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted). The Fourteenth Amendment "forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* at 721 (internal quotations omitted).

The substantive due process clause protects two types of privacy rights. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977): (1) an individual's right to make "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Lawrence v. Texas*,

---

[4] In her reply brief, Jenkins argues the privacy claim is also based on Shanell's disenrollment from school and Rock Hill's "intentional refusal" to provide a tutor. These claims were not mentioned in her original brief, and they are therefore waived. *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002) ("[T]he appellant cannot raise new issues in a reply brief.").

539 U.S. 558, 574 (2003); and (2) an individual's "interest in avoiding disclosure of personal matters." *Whalen*, 429 U.S. at 599; *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998). Plaintiffs assert their claim based on both types of privacy rights.

### 1.     *Fundamental Right of Child Rearing*

Plaintiffs claim a "parent's right to the orderly rearing and education of her child is afforded constitutional protection." Indeed, parents have a liberty interest in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000)*; see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) (Fourteenth Amendment prevents "unreasonably interfer[ing] with the liberty of parents and guardians to direct the upbringing and education of children under their control."); *Barrett v. Steubenville City Schools*, 388 F.3d 967, 972 (6th Cir. 2004) (noting the fundamental right of parents to raise their child has been clearly established); *Johnson v. City of Cincinnati*, 310 F.3d 484, 499 (6th Cir. 2002) ("[A] family member's right to participate in child rearing and education is one of the most basic and important associational rights protected by the Constitution.").

Evans's actions against Plaintiffs did not violate their fundamental rights. Mulkey was subjected to an interview and Jenkins was subject to an investigation and court complaint. But neither was deprived of her child. Neither lost care, custody, or control of her child nor the right to raise her child. At most, they were victims of something resembling malicious prosecution or defamation, neither of which are cognizable as constitutional violations of privacy. *Albright v. Oliver*, 510 U.S. 266, 271 n.4 (1994); *Paul v. Davis*, 424 U.S. 693, 702 (1976). There are cases in other circuits finding that parents who lost custody of their children because of malicious, false reports suffered constitutional violations. *Brokaw*, 235 F.3d at 1018-19; *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999); *Gedrich v. Fairfax County Dep't of Family Servs.*, 282 F. Supp. 2d 439, 461 (E.D. Va. 2003). Here, however, there was no separation. There is no constitutional violation in merely being subjected to a false report. *See also Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997) (holding that a "child abuse investigation does not, in and of itself, constitute a constitutional deprivation").

### 2.     *Avoiding Disclosure of Private Matters*

Plaintiffs also base their privacy claim on the alleged disclosure of information to Children Services. In *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir. 1981), this Court rejected the idea there is a general constitutional right of nondisclosure of personal information. Rather, "any constitutional right to privacy must be restricted to those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty." *Kallstrom*, 136 F.3d at 1062 (citing *DeSanti*, 653 F.2d at 1090) (internal quotation marks omitted).

In *Kallstrom*, the Court identified a situation where nondisclosure of personal information was a constitutionally protected right: undercover police officers have a constitutionally protected privacy interest in some personal information contained in their personnel files under the substantive due process clause. 136 F.3d at 1059. The officers' privacy interests in the personal information are of a constitutional dimension because they implicate a fundamental liberty interest, namely, their lives, their families' lives, and their personal security. *Id.* at 1062. Their personal security was threatened because the release of that information created a "serious risk to the personal safety" of the officers and their families from a violent gang likely to seek revenge. *Id.* at 1063. This Court has also held that "information regarding private sexual matters warrants constitutional protection against public dissemination." *Bloch v. Ribar*, 156 F.3d 673, 686 (6th Cir. 1998).

*Kallstrom* "did not create a broad right protecting plaintiffs' personal information." *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007) (release of correctional officers' social security numbers was not sensitive enough to warrant constitutional protection despite threat of retaliation);

*see also Bailey v. City of Port Huron,* --- F.3d ----, No. 06-2375, 2007 WL 3196505 (6th Cir. Nov. 1, 2007) (criminal suspects have no constitutional right to privacy in their mug shots or in information contained in a police report); *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 575 (6th Cir. 2002) (no privacy interest in personal financial affairs); *Doe v. Wigginton*, 21 F.3d 733 (6th Cir. 1994) (disclosure of HIV infection not violation of constitutional right to privacy).

Here, Plaintiffs lack a constitutional invasion of privacy claim because they were not put at a serious risk of losing a fundamental liberty interest. Although Jenkins did face a court complaint for child neglect, she was not separated from her child. The same is even more true for Mulkey; any harm to her from being interviewed by a Children Services investigator was at most de minimis.

For the same reason that Plaintiffs were not deprived of a fundamental right, they were not victimized by the dissemination of information that is not of a constitutional magnitude. Because Plaintiffs' privacy claims fail under either theory, the district court did not err in granting summary judgment on those claims.

### C. District Court's Factual Summaries

Plaintiffs also challenge the district court's orders granting summary judgment, contending they made improper credibility determinations and disputing some of the word choices the court used. Having reviewed the evidence in these cases and the district court's opinions, we conclude this challenge is without merit.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED with regard to Jenkins's First Amendment retaliation claim against Evans and is AFFIRMED on all other claims.