**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 17a0622n.06**

**No. 16-4691**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JEANETTA DENISE NAILON, | ) | **FILED** |
| | ) | Nov 09, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF CINCINNATI; SANTA J. ONO, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendants, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| and | ) | |
| | ) | OPINION |
| KEN WOLTERMAN; DEBRA JONES; KARLA | ) | |
| GACASAN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: MOORE, STRANCH, and DONALD, Circuit Judges

**JANE B. STRANCH, Circuit Judge.** Plaintiff Jeanetta Nailon worked as a collection

specialist in the Office of the Bursar at the University of Cincinnati from 2001 until 2013, when

she was terminated. The Bursar's Office claimed that she was fired because of unauthorized

involvement with her son's loan account. Nailon brought suit against the University and several

individuals working in the Bursar's Office, alleging, among other claims, that the officials

retaliated against her because of complaints made by Nailon's niece, Ashley Davis, concerning

racial discrimination by the Bursar's Office. Three defendants—Ken Wolterman, Debra Jones,

and Karla Gacasan—raised the defense of qualified immunity, which the district court denied. For the following reasons, we AFFIRM the district court's denial of qualified immunity.

## I.    BACKGROUND

Nailon was hired in 2000 to work in the University's Office of the Bursar as a collection specialist, also known as a Resolution Analyst. The Office of the Bursar is responsible for collecting student fees and managing certain student loans. Nailon's position entailed processing and collecting on loans made to University of Cincinnati students, and she was assigned a batch of accounts based on surnames within a particular alphabetical range. As a Resolution Analyst, Nailon had discretion to grant late fee waivers or remove blocks to student registration. From 2005 to 2008, she was responsible for accounts belonging to students with last names starting with the letters S through Z. During that time period, Frank Young, Nailon's son, was a student at the University and Nailon was assigned to Young's account. As was within her discretion as a Resolution Analyst, she made some changes to his account, including writing off several outstanding fees that he owed to the University. Nailon states that she did not perform any functions on her son's account that were outside the office policies and practices in place at the time of her work on the account, and that the Defendants admit that waivers applied to Young were based on properly completed applications that demonstrated justification for the waivers.

In 2009, the Bursar's Office employees switched alphabetical groups, and Nailon became responsible for student accounts within a different letter range. The record provides no indication that, at this time, others in the Office of the Bursar were aware of the inclusion of Nailon's son's account in her letter range. Several other staff members in the Bursar's Office, however, worked on Young's account after Nailon, including Karen Davis, another collection specialist, and Debra Jones, Associate Bursar and Nailon's supervisor. For example, Karen Davis issued Young a loan forbearance in 2011 and she testified that at the time she granted the

forbearance, she would have seen the history of Young's loan account activity, including the Resolution Analyst who had worked on it previously.

While Nailon was employed by the Bursar's office, her niece, Ashley Davis, also attended the University of Cincinnati. Nailon states that she and her niece were quite close, and Ashley lived with her for a time along with Davis's daughter. Davis testified that she felt Nailon took "the role of [her] Mom," and that was how she identified her. The relationship between Nailon and Davis was known by individuals working in the Bursar's Office, as Davis occasionally came by to visit her aunt at work. In February 2013, Davis applied for a short-term loan, which the Bursar processed. At the time, Nailon's alphabetical range of accounts covered students with surnames starting with "D," so she managed Davis's loan application. Nailon processed and approved Davis's loan, despite her niece's poor credit. Jones discovered this approval and reprimanded Nailon. Nailon states that this was the first time she had been informed that she was not allowed to work on a relative's account. Subsequently, in May 2013, the Bursar's Office issued a written policy explicitly prohibiting Resolution Analysts from working on accounts belonging to relatives.

Nailon's niece's account was then assigned to another collection specialist, Karen Davis. Karen Davis worked out a payment plan with Ashley to repay her short-term loan. In August 2013, Jones personally contacted Ashley Davis about the outstanding loan, notifying her that she would withdraw Davis from her classes if she did not pay her $4,000 balance in full before September 4. Davis disputed the amount owed, and notified Jones of the payment plan she had worked out with Karen Davis. Nonetheless, Jones withdrew Ashley Davis from her classes prior to the September 4 deadline. In response, on September 3, Davis contacted several University department heads to make a complaint about racial discrimination that she had encountered in

her interactions with the Bursar's Office. Davis's email was shared with UC officials, including Ken Wolterman, the Bursar, on the same day. Wolterman notified Jones about the email, and later the same night, sent a reply to other UC officials stating that "there is much more to know about this student." According to Wolterman's deposition testimony, he was referring to Nailon's work on Davis's loan, and in fact he "felt . . . there was collusion" between Nailon and her niece involved in the situation. Shortly after Davis made her complaint, Vice President of Student Affairs Debra Merchant worked with Davis to develop a payment plan, and re-enrolled Davis in her classes.

On September 10, 2013, Jones began investigating Nailon's previous involvement with her son's loan account after it was brought to her attention by other collection specialists, including Karen Davis. She looped in Wolterman and Karla Gacasan, a Senior Labor Relations Specialist in the University's human resources department. Wolterman testified that upon hearing this information, his reaction was to fire Nailon, that he was "tired," and that "enough [wa]s enough." Nailon was unaware of the investigation until she received a notice of termination on September 30, 2013, stating that she had violated the University's conduct policy. The notice specifically listed several transactions Nailon had performed on her son's account.

Nailon maintains that although the Office of the Bursar updated its employee manual in 2013 to prohibit employees from handling family members' accounts, there was no official policy that prevented Nailon from managing her son's account at the time she was assigned to it. Moreover, Nailon asserts that any of her activity on Young's account would have been known to individuals in the Bursar's Office, including Jones, long before the September 2013 investigation. The Defendants counter that the 2013 change to the manual made explicit a long-

standing departmental policy, and that the Bursar's Office committed the policy to writing specifically due to Nailon's activity with her son's account.

Following her termination, Nailon brought suit against Jones, Wolterman, and Gacasan, as well as the University of Cincinnati and Santa J. Ono[1], alleging that the defendants (1) discriminated against her on the basis of race, in violation of Title VII; (2) retaliated against her in violation of Title VII; (3) retaliated against her in violation of the First Amendment right to free speech because of her niece's complaints of racial discrimination; and (4) violated her due process rights. In two separate orders, the district court dismissed all of Nailon's claims except her claim of violation of the First Amendment right to free speech, brought pursuant to 42 U.S.C. § 1983. Determining that there was a genuine issue of material fact as to whether Davis's complaints of racial discrimination motivated the Office of the Bursar's decision to terminate Nailon, the district court denied summary judgment on that claim. The court also denied Wolterman, Jones, and Gacasan's request to dismiss the case on the basis of qualified immunity. It determined that the factual disputes identified in Nailon's First Amendment retaliation claim prevented applying qualified immunity at the summary judgment stage and that it should be clear to a reasonable University official in the circumstances presented that retaliating against Nailon on the basis of her niece's free speech would be unlawful. The individual defendants (hereinafter referred to as the Defendants) filed an interlocutory appeal on the question of qualified immunity.

---

[1] Ono filed a Motion to Dismiss Nailon's claims against him for failure to state a claim under Rule 12(b)(6) and on the basis of Eleventh Amendment immunity. Nailon did not oppose the motion, and Ono was dismissed from the action.

## II.        ANALYSIS

### A.        Jurisdiction & Standard of Review

A district court's denial of qualified immunity is appealable under § 1291 only "to the extent that it turns on an issue of law." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005)).  Thus, "a district court's determination that there exists a triable issue of fact *cannot* be appealed on an interlocutory basis, even when the finding arises in the context of an assertion of qualified immunity." *Gregory v. City of Louisville*, 444 F.3d 725, 742–43 (6th Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).

Nailon states that the Defendants exceed the boundaries of our jurisdiction by seeking review of the district court's determination that genuine factual disputes preclude summary judgment on her First Amendment retaliation claim.  Though the parties appear to disagree on many key facts, we maintain jurisdiction over the Defendants' appeal to the extent it raises pure questions of law.  Because we do not have jurisdiction over factual issues, "a defendant must concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Quigley*, 707 F.3d at 681.  Viewing the facts in the light most favorable to Nailon, we review de novo the district court's application of the doctrine of qualified immunity to her First Amendment retaliation claim.  *See Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (citing *Quigley*, 707 F.3d at 679).

### B.        Qualified Immunity

The doctrine of qualified immunity generally protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts evaluating the application of

qualified immunity examine two questions: (1) whether, viewing the facts in the light most favorable to the plaintiff, a constitutional violation occurred; and (2) whether the plaintiff's right was clearly established at the time of the incident. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). We may examine these questions in either order, and the defendant is entitled to qualified immunity if the plaintiff cannot establish both prongs of this inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 1. Constitutional Violation

Nailon claims that Jones, Wolterman, and Gacasan violated her First Amendment rights by terminating her in retaliation for Davis's allegations of racial discrimination by the Bursar's office. To state a First Amendment retaliation claim, the plaintiff must show: (1) that the speech was protected by the First Amendment; (2) she suffered an adverse employment action; and (3) the adverse action was motivated at least in part in response to the exercise of her constitutional rights. *See Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012) (quotation marks and citation omitted). Because Nailon was terminated from her position at the university, the second element of this test is not in dispute.

The district court found the first element satisfied because Davis engaged in constitutionally protected speech by alleging that University officials were discriminating against her based on race, and because a plaintiff may allege First Amendment retaliation after a relative has engaged in protected speech even if the plaintiff herself has not done so. In their appellate briefing, the Defendants seek to reframe Nailon's claim as implicating the First Amendment right to freedom of association. Not only is this the first time the Defendants have raised this argument; it also misrepresents Nailon's claims. Nailon does not claim that the Defendants violated her right to free association or to familial association. The Complaint alleges that the

Defendants terminated Nailon in retaliation for "her niece's constitutionally protected speech or conduct [that] violated [Nailon's] right to free speech on matters of public concern." As such, we examine below Nailon's claim using cases and precedent involving the First Amendment right to free speech.

Defendants next argue that Nailon's claim fails at the first step because the speech of a government employee making a First Amendment retaliation claim must have been made "as a citizen," while addressing "a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146–47 (1983). But the *Connick* requirements apply to the speech of government employees and the speech at issue was made by Ashley Davis, a private citizen, not Nailon herself. Private citizens, such as Davis, "have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *See Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (citing *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994)). The district court correctly recognized that Davis's speech need not touch upon a matter of public concern, because the public concern test is explicitly limited to government employees and is "based solely on the need to balance the free speech rights of government employees with the government's needs as an employer." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008). Davis's allegation of racial discrimination by University officials in the Bursar's Office was constitutionally protected speech. *Id.* ("[T]he right to criticize public officials is clearly protected by the First Amendment.") (citation omitted).

The third element of a First Amendment retaliation case examines whether a plaintiff has proven "a causal connection between the protected conduct and the adverse action." *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc). The district court determined that a reasonable juror could conclude that Nailon was terminated in retaliation for Davis's complaints

based on the temporal proximity of her termination to Davis's allegations, and Wolterman's deposition testimony that he believed there was "collusion" between Nailon and Davis. We agree.

The Defendants first argue that the district court erred by "focus[ing] almost exclusively on the temporal proximity" between Davis's speech and Nailon's termination. But close temporal proximity between a protected activity and the adverse action may serve as evidence of retaliation. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Moreover, the temporal proximity between Davis's speech and Nailon's firing was not the only basis for the court's decision. It also concluded that a reasonable juror could have determined that Nailon was terminated in retaliation for Davis's free speech based on Wolterman's comments that he suspected "collusion" between Nailon and Davis. To the extent that the Defendants ask us to reinterpret Wolterman's statements, we are without jurisdiction to make such a fact-based inquiry.

The Defendants also argue that University officials would have made the same decision to terminate Nailon even if Davis had not complained of discrimination, and that Nailon cannot establish a constitutional violation under the burden-shifting framework of a First Amendment retaliation claim. We agree with the district court that Nailon has produced sufficient evidence for a reasonable juror to conclude that University officials terminated her in retaliation for her niece's protected speech. Given the factual disputes as to Nailon's actual actions on her son's account and the rules and policies in place at the Bursar's Office during the relevant time period, the Defendants "have not demonstrated that no reasonable juror could fail to find" that University officials would have terminated Nailon absent Davis's conduct. *Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015).

On appeal, Defendants also argue that there is no evidence that Jones or Gacasan participated in conduct violating Nailon's rights because they were not involved in her termination. But "an influential recommender can be liable under § 1983 without being the final decision maker, if the recommendations are shown to be sufficiently influential." *See Stinebaugh v. City of Wapakoneta,* 630 F. App'x 522, 530 n.2 (quotation marks and citation omitted). Defendants' Reply concedes that Jones and Gacasan played a role in the investigation that led to Nailon's termination—Jones by "investigating Nailon's misconduct and . . . bringing it to Wolterman," and Gacasan by "review[ing] the investigation and inform[ing] the Bursar's Office that Human Resources would support termination." Viewing the disputed facts in the light most favorable to Nailon, a reasonable jury could find that they "played an influential role" in the termination and that their actions violated Nailon's First Amendment rights. *Stinebaugh*, 630 F. App'x at 530 n.2.

Indeed, viewing all these facts in the light most favorable to Nailon, she has demonstrated a causal connection between her termination and her niece's protected speech and established a First Amendment retaliation claim. She has thus satisfied the first prong of the qualified immunity analysis by showing a constitutional violation.

### 2. Clearly Established Law

Under the second prong of the qualified immunity test, Nailon must show that her first Amendment rights in this setting were clearly established at the time of her termination. A right is clearly established when its contours are sufficiently clear that a reasonable official would understand that his conduct violates that right. *See Anderson v. Creighton*, 438 U.S. 635, 640 (1987). To determine if a right is clearly established, we may look to "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits." *Wenk*, 783 F.3d

at 598 (quoting *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 477 (6th Cir. 2011). The "dispositive question is whether the violative nature of *particular* conduct is clearly established," and is examined "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The crucial question is whether public officials are on notice that their conduct is unlawful. "Public officials could 'still be on notice that their conduct violates established law even in novel factual circumstances.'" *Gaspers*, 648 F.3d at 417 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Defendants argue that there is no clearly established law putting a university official on notice that terminating an individual in retaliation for speech made by her niece would be a constitutional violation. In their principal brief, they allege it is "[n]ot clear at all that a claim of retaliation for the speech of a family member fits under the First Amendment." The district court determined that such a right was clearly established based on cases within this circuit that examined claims of First Amendment retaliation where the underlying speech was made by a relative, rather than the plaintiff herself. *See, e.g.*, *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 540–42 (6th Cir. 2003) (evaluating retaliation claim alleged by daughter based on protected speech made by father); *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (6th Cir. Aug. 11, 1999) (unpublished table decision) (evaluating retaliation claims alleged by daughters based on speech made by mother).

The Defendants revise this argument in their Reply. There they posit that even though there is precedent establishing that a First Amendment retaliation claim may be based on speech made by a relative, these cases involve a "closer" relationship between the speaker and the plaintiff than aunt and niece. They cite *Teare v. Independence Local School District Board of Education*, No. 1:10-cv-01711, 2011 WL 4633105, at *5 (N.D. Ohio Aug. 18, 2011), in which

the district court determined that the plaintiff, a thirteen-year-old girl, had not shown a clearly established right of familial association with her uncle. Again, Nailon does not assert a claim for violation of her associational rights—she alleges that the Defendants retaliated against her based on her niece's speech. Accordingly, *Teare* does not control our analysis.

The Supreme Court has found that in the Title VII context, a third-party reprisal can form the basis of a retaliation claim. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174-75 (2011) (holding that "it is obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew her fiancé would be fired); *see also Benison v. Ross*, 765 F.3d 649, 658-59 (6th Cir. 2014) (referencing *Thompson* in its evaluation of a First Amendment retaliation case brought under § 1983). Moreover, the Court has explicitly "decline[d] to identify a fixed class of relationships for which third-party reprisals are unlawful." *Thompson*, 562 U.S. at 175. It recognized that there may be "difficult line-drawing problems concerning the types of relationships entitled to protection," and that "the significance of any given act of retaliation will often depend on the particular circumstances." *Id.* at 174-75. *Thompson* confirms that *Ward* and *Henley* illustrate some situations in which reprisal against a close relation would dissuade protected conduct; they do not cabin or limit the types of familial relationships that support a third-party retaliation claim.

An examination of the facts in this case confirms that Nailon and Davis's relationship may form the basis for Nailon's retaliation claim. As in *Ward* and *Henley*, the close familial relationship between Nailon and Davis was known to the Defendants. For a time, Davis lived with Nailon and she visited Nailon at work in the Bursar's Office. Davis testified that she thought of Nailon as a mother, and identified her to others as such. The Defendants found the relationship sufficiently close to serve as the basis for discipline against Nailon when Defendants

discovered she had been working on Davis's account and had approved Davis for a short-term loan. Given these facts showing the close relationship between Nailon and Davis, as well as the cases establishing that private citizens have a protected First Amendment right to criticize public officials, *see, e.g.*, *Holzemer*, 621 F.3d at 520; *Jenkins*, 513 F.3d at 586, it should have been clear to a reasonable University official that retaliating against Nailon for Davis's speech would be unlawful. The Defendants are therefore not entitled to qualified immunity.

## III.  CONCLUSION

For the reasons explained above, we AFFIRM the district court's denial of qualified immunity to Wolterman, Jones, and Gacasan.