RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PETER WENK; ROBIN WENK,

        *Plaintiffs-Appellees,*

    *v.*

EDWARD O'REILLY,

        *Defendant.*

NANCY SCHOTT,

        *Defendant-Appellant.*

No. 14-3334

_____

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00474—Algenon L. Marbley, District Judge.

Argued: March 4, 2015

Decided and Filed: April 15, 2015

Before: MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

_____

### COUNSEL

_____

**ARGUED:** Matthew John Markling, MCGOWN & MARKLING CO., L.P.A., Akron, Ohio, for Appellant. Michael Garth Moore, Columbus, Ohio, for Appellees. **ON BRIEF:** Matthew John Markling, Patrick Vrobel, MCGOWN & MARKLING CO., L.P.A., Akron, Ohio, for Appellant. Michael Garth Moore, Columbus, Ohio, for Appellees.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiffs Peter Wenk and Robin Wenk, parents of an intellectually-disabled 17-year-old girl, brought suit under 42 U.S.C. § 1983 against

1

various defendants, including Nancy Schott, the Director of Pupil Services at their daughter's school. The Wenks allege that Schott filed a child abuse report about Peter Wenk in retaliation for the Wenks' advocacy to change their daughter's educational plan, and Schott therefore violated their First Amendment rights. The district court denied Schott qualified immunity, and Schott now appeals. The Wenks have moved for damages or, in the alternative, attorney fees and costs for defending this appeal. For the reasons set forth below, we **AFFIRM** the district court's judgment, and **DECLINE** to impose sanctions on the Appellant.

## I. BACKGROUND[1]

Married plaintiffs Peter and Robin Wenk have a daughter, M.W., who is "cognitively disabled," has "major communication deficits and social skills deficits," and has an IQ of 70 or below. R. 46 (Schott Dep. at 41). M.W. therefore requires special education services. During the events forming the basis of this suit, M.W. attended high school in the Grandview Heights City School District. School officials educate M.W. according to an Individualized Education Program ("IEP"), as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*.

During the 2009-2010 school year, Christine Sidon and Karla Hayes co-taught M.W. in a "social skills" class. R. 83 (Sidon Dep. at 37–38, 53). Sidon and Hayes agreed that Hayes "would do all the documentation," and that Sidon "would do the phone calls home to parents." *Id.* at 50. Sidon believed that Hayes was "documenting what was happening in social skills," including "[a]nything odd." *Id.* at 50–51. Beginning in 2009, Hayes made handwritten notes about various comments made by M.W. and observations Hayes made about M.W., which she later compiled into a typed document. Hayes's notes suggest that she began documenting her observations at the suggestion of Kathy Binau, the Director of Pupil Services at the time, school psychologist Eric Pickering, and Jesse Truett, the Principal.

Hayes recorded the following incidents: (1) on October 14, 2009, during a discussion with the female students "about proper hygiene when they have their menstrual period[,] [M.W.]

---

[1]Much of the record is sealed in this case, so many documents do not have page ID numbers.

raised her hand and told us that her dad puts her tampons in her and it really hurts her,"[2] and that she repeated this comment on November 16, 2010; (2) on December 8, 2009, M.W. said "that sometimes she and her dad lick each other on the faces and necks" and that "her whole family hangs around the house naked sometimes"; (3) on January 27, 2010, M.W. said "that her private parts are 'sticky and itchy,'" and that M.W. repeated this comment in 2010 on February 10, March 10, May 17, and December 13, and on February 23, 2011; (4) on January 28, 2010, M.W. told them that "her Dad put her cream on her vagina for her," and that she repeated this on March 10, 2010 and on February 23, 2011; (5) on February 18, 2010, at an IEP meeting, Peter Wenk said "he really wanted us to find a boyfriend for [M.W.]," and that a certain boy "can do whatever he wants to do to [M.W.] on a date and her father is giving him permission"; (6) on February 25, 2010, Hayes observed Peter Wenk kiss M.W. "on the lips" before leaving; (7) on January 4, 2011, Peter Wenk told Sidon that he gets in the shower with M.W. to help her wash her hair, and that M.W. said that "Dad takes off his clothes when he gets in the shower with her"; and (8) on January 6, 2011, M.W. said that "my dad and me and Frankie [their dog] sit on the carpet and scoot our butts across the floor." R. 102-3 (Hayes Notes at 2–7).[3]

Sidon disputes the accuracy of some of these observations in Hayes's notes. She testified in her deposition that "I have some concerns about the number of times that it says that [M.W.] said that dad put cream on her or dad put the tampon in. I personally do not remember it being that many times." R. 83 (Sidon Dep. at 30). Sidon also testified that she did not remember M.W. making the statements about cream, tampons or showering in the fall of 2011. *Id.* at 157. Finally, Sidon testified that she perceived Peter Wenk to be "joking" about the boyfriend comments at the meeting on February 18, 2010. *Id.* at 177–78.

---

[2]Hayes's notes indicate that it was when she and Sidon reported this incident to Binau, Pickering, and Truett that they told her to document similar incidents. R. 102-3 (Hayes Notes at 2) ("All three administrators told us to just document this information and until we had solid evidence of abuse, we should not contact children's services.").

[3]The Wenks also argue that the document is not authenticated "and repudiated by Chris Sidon." Appellee Br. at 8. Sidon testified in her deposition that she had seen one document in a folder Hayes showed her before they met with Schott, but that it was a different document than the compilation of Hayes's notes presented by Defendants. *Id.*; R. 83 (Sidon Dep. at 159, 162). However, Hayes states in her supplemental affidavit that the notes are "[a] true and accurate copy of" her type-written notes. R. 102-3 (Hayes Supp. Aff. ¶ 4).

**A.  Interactions between Nancy Schott and Peter Wenk**

In the 2011-2012 school year, Defendant Nancy Schott became the Director of Pupil Services.  Dawn Sayre became the Principal.  Ed O'Reilly had been the Superintendent of the school district since 2006.

On September 2, 2011, Peter Wenk and Schott met for the first time at a meeting.  Wenk advocated for the District to organize a "special ed prom" with students from a nearby school district because he felt M.W. had inadequate social opportunities.  R. 46 (Schott Dep. at 112); R. 106 (P. Wenk Dep. at 29, 34).  Schott testified in her deposition that Wenk was "very aggressive, very demanding, [and that he] wanted to make it clear that what he wanted is something that Dawn [Sayre] and [Schott] should respond to."  R. 46 (Schott Dep. at 190).

Peter Wenk next met with Schott, as well as Sayre, on October 19, 2011, to discuss amendments that the Wenks had proposed to M.W.'s IEP.  Wenk and Sayre ended up arguing.  Wenk testified that Sayre got upset when he asked to discuss "inclusion"—"social opportunities in the school"—which Sayre said was beyond the scope of the meeting.  R. 106 (P. Wenk Dep. at 45, 48).  Schott "smoothed . . . over" the dispute and then Wenk left.  R. 83 (Sidon Dep. at 143); R. 106 (P. Wenk Dep. at 47).[4]

After that meeting, Schott participated in two email exchanges about Peter Wenk.  On October 20, 2011, Schott emailed the staff present at the October 19 meeting to report that "[w]hile it was an emotion [sic] charged event, I am hopeful that we have laid groundwork for future meetings that will help eliminate his long time assumption that 'what he wants; he gets.'"  R. 103-7 (Oct. 20, 2011 Email at 1).  On October 24, 2011, Schott responded to an email from Hayes, which reported that Wenk had asked to be taken off an email notification system for parents, that Schott "wonder[ed] if he [is] purposely removing his email access as a way to force us to spoon feed [him] information."  R. 103-8 (Oct. 24, 2011 Email Exchange at 2).

Apart from meetings with Schott, Peter Wenk contacted Cathy Csanyi at the Ohio Department of Education to discuss his concerns about M.W.'s inadequate social opportunities.

---

[4]Schott and Peter Wenk met once more around November 17, 2011.  The meeting concerned M.W.'s upcoming tri-annual evaluation as required by 34 C.F.R. § 300.303, and did not involve issues relating to M.W.'s social inclusion.

On October 28, 2011, Joe Farry, a consultant for the Educational Service Center of Central Ohio who worked with the Ohio Department of Education, contacted Nancy Schott and "indicated [that] he had received a call from Mr. Wenk, and he wondered if [Schott] wanted any assistance in addressing the issues that Mr. Wenk had brought to his attention." R. 46 (Schott Dep. at 266–67); R. 106 (P. Wenk Dep. at 53). Schott declined Farry's assistance.

## B. Report to Franklin County Children Services

In the fall of 2011, Hayes and Sidon approached Schott to discuss "concerns" Hayes had about Peter Wenk's treatment of M.W. R. 102-2 (Hayes Aff. ¶ 4). Hayes initiated the meeting on her own; neither Schott nor O'Reilly solicited this information from her. *Id.* Sidon testified that Hayes decided to come forward in part because of the allegations of child abuse by Jerry Sandusky at Penn State University, and that Hayes said "that she was not going to sit on the documentation any longer." R. 83 (Sidon Dep. at 156). Schott met with Sidon and Hayes together. Schott did not take written notes of their conversation, and she did not independently investigate the allegations.

On November 18, 2011, Schott called Franklin County Children Services ("FCCS"). She testified that the "trigger" that prompted her to call FCCS was a comment relayed to her by Hayes and Sidon "either the day before I made the call or that day." R. 46 (Schott Dep. at 11); *see also* R. 103 (O'Reilly Dep. at 9). Schott claims that Hayes and Sidon told her that [M.W.] "made the comment that she wasn't going to have sex again because it hurt." R. 46 (Schott Dep. at 11).[5]

Schott testified that she relayed the following information to an intake worker at FCCS: (1) "past concerns that dad had [been] observed to kiss [M.W.] . . . open mouthed at school," *id.* at 78; (2) that M.W. "came to school with a swollen stomach, morning sickness, nausea, and presented symptoms like she was pregnant," but that Robin Wenk was not concerned when contacted and then M.W. "came to school with a hospital bracelet" that Peter Wenk said was due to blood work, but "the vomiting and her appearance of [a] swollen stomach immediately

---

[5]Schott testified that she consulted with O'Reilly and a school-district attorney before she called FCCS. R. 46 (Schott Dep. at 56). Schott testified that she asked O'Reilly whether she should call FCCS and he agreed that she should. *Id.* at 74. However, O'Reilly testified in his deposition that Schott "didn't ask for [his] approval, she just told [him] she was going to do it." R. 103 (O'Reilly Dep. at 167).

disappeared," *id.* at 89–90;[6] (3) that M.W. stated that "dad would insert her tampons for her," *id.* at 95; (4) that M.W. reported that her dad would "shower with her naked and helped her wash her hair," *id.*; (5) that "[t]his year, [M.W.] has been talking about a lot of itchiness in her vaginal area and states it's sticky and itchy," *id.* at 96; (6) that when asked by a teacher about a low-cut shirt she was wearing, M.W. responded that "she knew it excites the boys" but that "[she's] not going to have sex anymore because I know it hurts," and that when asked how she knows about this, M.W. "just put her [head] down and did not answer", *id.* at 97; (7) that M.W. stated that her "dad is the one who puts the cream" on her vagina, *id.* at 102–03; (8) that M.W. made comments "about her and her dad being naked and crawling across the floor," *id.* at 107; and (9) that Peter Wenk "insisted including in the IEP that [M.W.] would have a boyfriend" and that Peter has an "obsession about [M.W.] having a boyfriend," *id.* at 108, 110; *see also* R. 105-2 (Intake Narrative at 2–3).

Schott also included many comments about Peter Wenk's physical appearance and demeanor in her report to FCCS. Although she admitted that it did "not [have] anything to do with the sexual abuse," Schott called Peter Wenk "unkempt," explaining that she meant that his hair was "not groomed or cut, shirt ruffled, messed up." R. 46 (Schott Dep. at 12–13). Schott also reported to FCCS that staff members had described Wenk as "creepy" and that he made their "skin crawl," they were "fearful of meeting him," they reported Wenk as having "drastic changes in his mood," and that from her observations, he was "verbally aggressive, bullies other staff and becomes upset when things don't go his way." *Id.* at 123, 125, 136. Schott told FCCS that "as aggressive as dad is at school and with staff, [she] can't imagine him acting any different at home." *Id.* at 129. Finally, Schott stated that Peter Wenk had been "known to discredit mom during meetings," that he might prevent Robin Wenk from coming to meetings, and that "[h]e has been overheard telling mom to shut up in front of other staff at school." *Id.*

Schott claims that all of the information that she reported to FCCS came from Hayes and Sidon. *Id.* at 75, 95–98, 102–103, 107–08. It is not completely clear when Schott claims she learned all of the information that she reported to FCCS. Schott testified that she met with Hayes

---

[6]Schott testified that she did not use the word "pregnant." R. 46 (Schott Dep. at 90). The FCCS intake worker's notes, however, state, "and presented symptoms like [M.W.] was pregnant." R. 105-2 (Intake Narrative at 3).

and Sidon over a two-day period before she called FCCS (beginning on November 16, 2011). R. 46 (Schott Dep. at 237). However, Schott also testified that she learned most of the allegations in the "three weeks" before she called FCCS. *Id.* at 56, 92, 142, 144; *see also* R. 105-2 (Intake Narrative at 5); R. 139 (Tr. Mot. Hr'g at 20–22). The only allegation that Schott testified that she was certain she learned right before calling FCCS was the "trigger"—the comment that M.W. said she did not want to have sex anymore because it hurt. R. 46 (Schott Dep. at 11). Hayes and Sidon were never disciplined for not coming forward earlier with the allegations that they brought to Schott. *Id.* at 161.

## C. Allegations disputed by Sidon and Hayes

Hayes and Sidon dispute that they told Schott much of the information that Schott reported to FCCS or that some of the events Schott reported ever occurred. Hayes swore in her declaration and affidavits that she never showed Schott or O'Reilly her type-written notes and that she never informed Schott (1) that Peter Wenk showered naked with M.W; rather, she said "that MW stated her father took his clothes off and got in the shower with her"; (2) that M.W. and her father crawled naked on the floor together; rather, she reported that "MW stated she and her father would scoot across the floor"; (3) "[t]hat MW had stated that she wasn't going to have sex anymore because it hurts"; or (4) that "MW came to school with a swollen stomach and morning sickness, nor did I report that MW appeared to be pregnant, nor report any other facts that could lead to the reasonable inference that MW was pregnant" or that she "came to school one day with a hospital bracelet on her wrist." R. 111-1 (Hayes Decl. ¶ 6, 8); R. 102-2 (Hayes Aff. ¶ 3); R. 102-3 (Hayes Supp. Aff. ¶ 5). Hayes does state that during the fall of 2011, M.W. said "that she wasn't going to do it because it hurts." R. 102-2 (Hayes Aff. ¶ 3(g)). However, when "asked what hurts, having sex or having a baby," M.W. "indicated *having a baby*." *Id.* (emphasis added). Hayes does not state in her affidavit whether she reported the baby comment to Schott. *Id.* Moreover, although Hayes states that "[o]n occasion, [she] observed Pete Wenk kiss MW on the lips," she does not say *open-mouthed* kissing as Schott reported. *Id.* ¶ 3(a). Again, Hayes does not state in her affidavit whether she told this particular comment to Schott. *Id.*

Sidon testified in her deposition that neither she nor Hayes (at least in her presence) ever told Schott that (1) M.W. said she did not want to have sex anymore because it hurts, R. 83 (Sidon Dep. at 144–45); (2) Peter Wenk "discredited his wife," that "Peter Wenk had drastic mood changes" or that he "was controlling of his wife," *id.* at 146–47; (3) M.W. had a "swollen stomach," "morning sickness," or that "the morning gagging went away after [M.W.] came back from the hospital with a bracelet on her wrist," or used the word "pregnancy," *id.* at 150–52; (4) M.W. "had said that her father showered with her naked," *id.* at 152; (5) M.W. said her vagina was sticky and itchy in the fall of 2011, *id.* at 153–54; (6) M.W. said her father put cream on her vagina in the fall of 2011, *id.* at 154; (7) M.W. said that she and her father crawled naked on the floor together, *id.* at 154–55; or (8) "Pete Wenk demanded that [Sidon] create a list of boyfriends" for M.W., *id.* at 155. Sidon also testified that she did not tell Schott that Peter Wenk kissed M.W. on the mouth, although she could not remember if Hayes did. *Id.* at 148. Moreover, Sidon testified that she had a "good relationship" with Peter Wenk, he "[n]ever made [her] skin crawl," she was "never fearful of meeting him," and she did not find him "creepy." *Id.* at 102. She did testify that Peter Wenk had been "verbally aggressive" a few times, but "[they] ironed it out." *Id.*

Thus, the only allegations that are completely uncontested in the report Schott made to FCCS are that (1) sometime before the fall of 2011, M.W. said that her dad puts tampons in her, (2) sometime before the fall of 2011, M.W. said that her dad puts cream on her vagina and that M.W. said her vagina was sticky and itchy, and (3) M.W. said that her dad showered with her to help her wash her hair, and that he took his clothes off so that they would not get wet.[7] The parties do not dispute that Peter Wenk is a licensed practical nurse. R. 106 (P. Wenk Dep. at 9).

After November 18, 2011, Peter Wenk "stopped making demands on" Schott and his communications with her and her staff almost ceased. R. 46 (Schott Dept. at 269). Grandview Heights Police Department ("GHPD") initiated a criminal investigation into Peter Wenk. R. 106

---

[7]Robin Wenk admitted the truth of these allegations in a much more limited way than Schott claims. Appellant Br. at 29. Robin Wenk testified that Peter Wenk *once* inserted a tampon for M.W. when she was 12 or 13 and got her period at a swim meet. R. 105 (R. Wenk Dep. at 41–42). Similarly, Robin Wenk testified that Peter Wenk once put cream on M.W.'s vagina "a long time ago" when she had a rash and while Robin Wenk was present. *Id.* at 42–43. Although Robin Wenk testified that M.W. might have shown up to school with a swollen stomach and a medical bracelet, she explained that her swollen stomach was the result of a medical condition that gives M.W. "low muscle tone," and that M.W. sometimes has to get her blood drawn to monitor her seizure medicine, which would explain the medical bracelet. *Id.* at 47–48, 58–60.

(P. Wenk Dep. at 123–24).  On January 5, 2012, FCCS found that the child abuse allegations against Peter Wenk were unsubstantiated.  *Id.* at 162.  GHPD also dropped the criminal investigation against Peter Wenk.  *Id.* at 128.

## D.  Procedural History

On June 4, 2012, the Wenks filed a complaint pursuant to 42 U.S.C. § 1983 alleging First Amendment retaliation and violations of substantive due process by Schott, O'Reilly, and Sayre.  On July 9, 2012, Defendants moved to dismiss.  On December 14, 2012, the Wenks amended their complaint to remove the substantive due process claims, to add a claim for conspiracy, and to add Sidon and Hayes as defendants.  On February 11, 2013, Defendants again moved to dismiss.  The Wenks later voluntarily dismissed Sidon, Hayes, and Sayre as defendants.  On July 9, 2013, the Wenks moved for partial summary judgment.  On September 13, 2013, the district court denied the remaining defendants' motion to dismiss.  Schott and O'Reilly then moved for summary judgment, and asserted qualified immunity.

After hearing oral argument on March 10, 2014, the district court denied both parties summary judgment as to the First Amendment retaliation claim against Schott, and granted in part and denied in part the parties' summary judgment motions with regard to O'Reilly.  The district court also denied Schott and O'Reilly summary judgment on the basis of qualified immunity.  Schott filed a timely appeal.  On June 9, 2014, the district court dismissed O'Reilly with prejudice as a defendant after the parties advised the court that "the claims against him have been resolved."  R. 142 (Order Dismissing Def.) (Page ID #1992).

## II.  JURISDICTION

Jurisdiction in this case arises under 28 U.S.C. § 1291.  Although denials of summary judgment are not usually a final judgment, "district court denials of qualified immunity may be appealed as collateral orders where (1) the defendant is a public official asserting the defense of qualified immunity, and (2) the issue appealed concerns not which facts the parties might be able to prove, but whether certain alleged facts reflect a violation of clearly established law." *Hoover v. Radabaugh,* 307 F.3d 460, 465 (6th Cir. 2002).  Put differently, the appeal must "present[] a neat abstract [issue] of law rather than the question of whether the record demonstrates a genuine

issue of fact for trial." *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002) (internal quotation marks omitted); *see also Johnson v. Jones*, 515 U.S. 304, 313 (1995) (holding that a "[d]istrict [c]ourt's determination that the summary judgment record . . . raised a genuine issue of fact" is not immediately appealable). Where an appeal "make[s] some factual arguments" but "also presents . . . discrete legal question[s]," we can exercise jurisdiction over the legal questions while declining to address the factual arguments. *Marvin v. City of Taylor*, 509 F.3d 234, 237 (6th Cir. 2007).

In this case, Schott "make[s] some factual arguments" but "also presents . . . discrete legal question[s]," as indicated in the analysis below. *See id.* Thus, we will consider her legal arguments while declining to review her factual arguments.

### III.  ANALYSIS

#### A.  Standard of Review

"We review the denial of summary judgment on the basis of qualified immunity de novo." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Summary judgment is warranted only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). In appeals of denials of qualified immunity, we "view the facts in the light most favorable to the plaintiff." *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 412 (6th Cir. 2011).

#### B.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Recently, the Supreme Court has applied a two-step approach to determine whether a district court properly denied a defendant qualified immunity. *See, e.g.*, *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023–24 (2014). Under this two-step approach, we consider (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly

established' at the time of defendant's alleged misconduct," although not necessarily in this order. *Pearson*, 555 U.S. at 231–32, 241–42.

### 1. Constitutional Violation

We analyze First Amendment retaliation claims under a burden-shifting framework. "A plaintiff must first make a prima facie case of retaliation," which has three elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (internal quotation marks omitted); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). If the plaintiff establishes this prima facie case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Gaspers*, 648 F.3d at 412 (internal quotation marks omitted). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294–95. "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Id.* at 295.

Schott does not contest that the Wenks' advocacy about M.W.'s educational plan is protected activity. Rather, Schott argues that the Wenks cannot establish the second and third elements of their prima facie case. First, blurring the second and third elements, Schott argues that as a matter of law, a mandatory reporter's report of child abuse is not an adverse action where there is evidence in the record "sufficient to form a reasonable basis to make a report" and the plaintiffs do not present evidence that the report is materially false. Appellant Br. at 27–28. Schott argues that the three allegations in Schott's report to FCCS that the Wenks do not contest—that Peter Wenk showered with M.W., inserted tampons for her, and put cream on M.W.'s vagina—are "by any objective measure, sufficient to form a reasonable basis to make a report." *Id.* at 27. Therefore, Schott claims that the Wenks must show that the report was materially false, which they cannot do because the minor inconsistencies in her report are

"reasonable errors." *Id.* at 29. Second, Schott argues that "the Wenks cannot show that a constitutionally protected activity actually motivated Dr. Schott's conduct since she submitted her report immediately after the meeting with Hayes and Sidon." *Id.* at 31. Finally, Schott argues that she would have made the same report to FCCS absent the Wenks' protected conduct because she is a mandatory reporter under Ohio law. *Id.* at 34.

For the reasons discussed below, we hold that the facts taken in the light most favorable to the Wenks establish a violation of the First Amendment. The Wenks have made out a prima facie case of First Amendment retaliation. Schott has not demonstrated that, "in light of the evidence viewed in the light most favorable to the [Wenks], no reasonable juror could fail" to find that Schott would have made the same report of child abuse in the absence of the Wenks' protected conduct. *Dye*, 702 F.3d at 294–95.

### a. The Wenks have established the second element of the prima facie case, adverse action.

Schott's child abuse report constitutes an adverse action. We have held twice that reports of child abuse "would deter a person of ordinary firmness from continuing to engage" in protected conduct under the First Amendment and therefore such reports can constitute adverse action. *Gaspers*, 648 F.3d at 412 (internal quotation marks omitted). In *Jenkins v. Rock Hill Local School District*, 513 F.3d 580 (6th Cir. 2008), we held that conduct including "making a false report to Children Services . . . would chill a person of ordinary firmness from engaging in speech" and could therefore satisfy the adverse action requirement of a First Amendment retaliation claim. *Id.* at 589. Although we stated the rule with regard to false reports, we did not expressly hold that *only* false reports are adverse actions. The truth or lack thereof of a child abuse report is not dispositive to whether the report would chill a person from engaging in protected conduct.

In *A.C. ex rel. J.C. v. Shelby County Board of Education*, 711 F.3d 687 (6th Cir. 2013), we cited *Jenkins* in holding that making a report of child abuse—without limiting the principle to false reports—can be an adverse action. *Id.* at 698. Unlike the present case, the parents brought a retaliation claim under the ADA rather than the First Amendment, but that distinction is not relevant because the definition of adverse action is essentially the same for both types of claims.

*Compare id.* (explaining that an adverse action "must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances cannot qualify.'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006))), *with Wurzelbacher v. Jones-Kelley,* 675 F.3d 580, 583 (6th Cir. 2012) ("In the First Amendment context, . . . we have held that any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action]." (internal quotation marks omitted)).    We explained that a report of child abuse has "powerfully dissuasive" consequences that would lead reasonable parents to refrain from engaging in protected activity: "[h]aving a government official appear at their door armed not only with the power to take their . . . child away but also with allegations that they are . . . abusing that child," and an "intrusive investigation" of the parents' homes and children that is often required under state law. *A.C. ex rel. J.C.*, 711 F.3d at 698.

### b. The Wenks have established the third element of the prima facie case, causal connection.

The Wenks have established that Schott "was motivated at least in part by [the Wenks'] protected conduct" in filing the child abuse report. *Dye*, 702 F.3d at 294. "The issue in a First Amendment retaliation claim is the *grounds actually relied upon, not those that might have been relied upon by some other government agent in a similar situation.*" *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (emphasis added). Therefore, we have repeatedly held that "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 *even if the act, when taken for a different reason, would have been proper.*" *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir. 1998) (emphasis added) (internal quotation marks omitted); *see also id.* at 682–83 (reversing dismissal of the plaintiffs' First Amendment retaliation claim based on a sheriff's lawful release of truthful humiliating information about the plaintiffs' daughter's rape because it "was motivated at least in part as a response to the [plaintiffs'] exercise" of their First Amendment rights, criticisms they had made of the rape investigation); *Paige v. Coyner*, 614 F.3d 273, 283 (6th Cir. 2010) (reversing the district court's dismissal of the plaintiff's First Amendment retaliation claim on the basis of a call the county official made to the plaintiff's employer because even if the call "would be proper

if prompted by purely business or governmental concerns," the call would violate the First Amendment if it were "prompted by retaliatory motives").

Under this rule, then, a report of child abuse—even if it is not materially false and there is evidence in the record that could support a "reasonable basis" to suspect child abuse—is actionable if the reporter *actually* made the report "at least in part" for retaliatory motives. Schott cites no Sixth Circuit case law supporting her argument for what would be an exception to these general principles, and we see no reason to adopt such an exception now.[8]

Here, the Wenks presented ample evidence that Schott was motivated at least in part by a retaliatory motive to make the child abuse report about Peter Wenk. Schott called FCCS only three weeks after Farry from the Ohio Department of Education contacted her about the Wenks' concerns with M.W.'s educational plan. Schott's emails after her meetings with Peter Wenk suggest that she harbored animus against him as a result of his advocacy about M.W.'s educational plan. R. 103-7 (Oct. 20, 2011 Email at 1); R. 103-8 (Oct. 24, 2011 Email Exchange at 2). Although Schott's report did contain some true allegations, the facts taken in the light most favorable to the Wenks suggest that she embellished or entirely fabricated other allegations, including those that most clearly suggested sexual abuse. The district court noted numerous inconsistences between what Hayes and Sidon testified they told Schott—Schott's only source of information for the allegations—and what she reported to FCCS, namely that "[n]either Hayes nor Sidon ever told Schott that M.W. talked about how she would not have sex again because it

---

[8]The burden-shifting framework of First Amendment retaliation claims can address Schott's concerns about a potential chilling effect on mandatory reporters. Under Ohio law, mandatory reporters who "know[], or ha[ve] reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect" child abuse must "immediately" report those suspicions. Ohio Rev. Code § 2151.421(A)(1)(a). School officials are mandatory reporters. *Id.* § 2151.421(A)(1)(b). A mandatory reporter who fails to report suspected child abuse as required by § 2151.421(A) is guilty of a misdemeanor of the fourth degree. *Id.* § 2151.99(C)(1). As even true reports of child abuse might be actionable, in theory "mandated reporters" might face "the unwelcome choice of whether to suffer [ ] § 1983 liability for reporting or . . . liability [under state law] for not doing so." *Oglesby v. Eikszta*, No. 1:07-CV-00051 NPM, 2011 WL 4442932, at *9 (N.D.N.Y. Sept. 22, 2011) (internal quotation marks omitted). However, mandatory reporters can certainly point to their statutory reporting obligations to support their argument that they would have made a report of child abuse "even in the absence of the protected conduct." *Gaspers*, 648 F.3d at 412. If such reporters can also show that they reported only true allegations (i.e. none are fabricated) that they believed established reasonable cause to suspect child abuse, and their own actions support this belief (for example, they quickly reported those allegations), that evidence seems likely in most cases to support finding that there is no genuine dispute that the reporter would have taken the action even in the absence of the protected activity. As discussed in the next subsection, however, Schott's own actions—at least when viewed in the light most favorable to the Wenks—do not support her claim that she would have called FCCS absent the Wenks' protected conduct.

hurt, or that M.W. came to school gagging, vomiting, and with a bloated stomach," and "Sidon testified that neither she, nor Hayes, ever informed Schott that Mr. Wenk kissed M.W. on the lips, that she showered with her father *naked*, or that they crawled on the floor together naked." R. 124 (Dist. Ct. Op. at 18) (Page ID #1882) (emphasis added); *Wenk v. O'Reilly*, No. 2:12-CV-00474, 2014 WL 971939, at *11 (S.D. Ohio Mar. 12, 2014).[9]   Schott's report to FCCS also included "irrelevant personal allegations against Mr. Wenk," such as that he was "creepy" and "intimidated" the staff.  R. 124 (Dist. Ct. Op. at 18) (Page ID #1882); *Wenk*, 2014 WL 971939, at *11.

Schott's additional argument that "the Wenks cannot show that a constitutionally protected activity actually motivated Dr. Schott's conduct since she submitted her report immediately after the meeting with Hayes and Sidon" contests whether the district court accurately found factual disputes on this issue, and thus we lack jurisdiction to consider this argument under *Johnson v. Jones*, 515 U.S. at 313.  *See* 515 U.S. at 313.  Schott does not argue that these factual determinations are "blatantly and demonstrably false," an exception to this rule. *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009).  Moreover, the premise of this argument—that Schott immediately reported the allegations—ignores factual disputes as to how quickly Schott reported some of the allegations.  Schott testified that she learned most of the allegations in the "three weeks" before she called FCCS.  R. 46 (Schott Dep. at 56, 92, 142, 144); *see also* R. 105-2 (Intake Narrative at 5); R. 139 (Tr. Mot. Hr'g at 20–22).  The only allegation that Schott testified that she was certain she learned right before calling FCCS was the "trigger"—the comment that M.W. said she did not want to have sex anymore because it hurt— which Sidon and Hayes claim they never told Schott.  R. 46 (Schott Dep. at 11).  Thus, taking the facts in the light most favorable to the Wenks, Schott knew of the undisputed allegations for *three weeks* before she called FCCS.

---

[9]The district court misses that Sidon testified that she did not remember if Hayes told Schott that Hayes saw Peter Wenk kiss M.W. on the mouth.  R. 83 (Sidon Dep. at 148).  Although Hayes stated in her affidavit that "[o]n occasion, [she] observed Pete Wenk kiss MW on the lips," she does not say *open-mouthed* kissing as Schott reported.  R. 102-2 (Hayes Aff. ¶ 3(a)).  Additionally, Hayes does not state in her affidavit whether she reported this to Schott.  *Id.*

> **c. Schott has not demonstrated that no reasonable juror could fail to find that she would have called FCCS absent the Wenks' protected conduct.**

Schott's argument that she would have made the same report to FCCS absent the Wenks' protected conduct simply because she is a mandatory reporter of child abuse under Ohio law also takes issue with whether the district court accurately found factual disputes on this issue, and therefore we lack jurisdiction to consider this argument under *Johnson v. Jones*, 515 U.S. at 313. Appellant Br. at 34–35. Again, Schott does not argue that the exception for "blatantly and demonstrably false" factual determinations applies. *Moldowan*, 578 F.3d at 370.

Even if we did have jurisdiction, the fact that Schott is a mandatory reporter under Ohio law and would face liability for not reporting suspected child abuse is relevant, but it does not conclusively establish that she would have made the same report to FCCS absent the Wenks' protected activity. Again, Schott's burden is to show that *she actually believed* that her duty to report was triggered and that she made this report because of that duty. *Holzemer*, 621 F.3d at 527 ("The issue in a First Amendment retaliation claim is the *grounds actually relied upon*, *not those that might have been relied upon by some other government agent in a similar situation*.") (emphasis added).

The district court found that the Wenks had pointed to several pieces of evidence that created a genuine dispute whether Schott would have made the report even if the Wenks had not advocated for changes in M.W.'s educational plan: (1) the same inconsistencies in the report discussed above, many of which, if the facts are taken in the light most favorable to the Wenks, suggest that Schott added false details to heighten the sexual nature of the allegations; (2) "the fact that the 'trigger' for Schott's reporting—the alleged comment from M.W. that she would not have sex again, because it hurt—was not something that either Hayes or Sidon ever told Schott"; and (3) that "neither Sidon nor Hayes was ever reprimanded for their failure to report" the three uncontested allegations in Schott's report despite documenting them beginning in 2009, which "undercuts the notion that Schott or the District truly believed that the allegations required reporting." R. 124 (Dist. Ct. Op. at 20) (Page ID #1884) (internal citations omitted); *Wenk*, 2014 WL 971939, at *12. The Ohio statute requires that a mandatory reporter *immediately* report suspected child abuse. Ohio Rev. Code § 2151.421(A)(1)(a). Again, however, Schott knew of

the three uncontested allegations for three weeks before she reported them, if the evidence is taken in the light most favorable to the Wenks. R. 124 (Dist. Ct. Op. at 18–19) (Page ID #1882–83); *Wenk*, 2014 WL 971939, at *11; R. 46 (Schott Dep. at 95) (testifying that she did not recall when she learned of these three allegations). This also suggests that Schott did not think that the uncontested allegations triggered her duty to report. Finally, although not mentioned by the district court, other evidence in the records suggests that other school officials did not think that all or some of these uncontested allegations triggered a duty to report. R. 83 (Sidon Dep. at 183) (testifying that she would not have called FCCS based on these allegations); R. 102-3 (Hayes Notes for Oct. 14, 2009) (stating that the former Director of Pupil Services, the former principal, and a school psychologist did not think that the first tampon comment M.W. made warranted calling FCCS).

In sum, when we view the facts in the light most favorable to the Wenks, we hold that the Wenks have established a violation of their First Amendment rights. The Wenks have established a prima facia case of First Amendment retaliation, and Schott has not demonstrated that no reasonable juror could fail to find that she would have called FCCS absent the Wenks' protected conduct.

### 2. Clearly Established Law

The Supreme Court recently described the inquiry as to whether a reasonable official would understand that he or she is violating a clearly established right as follows: "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff*, 134 S. Ct. at 2023 (internal quotation marks and citation omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Gaspers*, 648 F.3d at 417 (internal quotation marks omitted).

The "clearly established law" should not be defined "at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular

circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (internal quotation marks and citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Gaspers*, 648 F.3d at 417 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "Public officials could 'still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Schott does not contest that the Wenks' right to be free from retaliation for exercising their First Amendment right to criticize school officials is clearly established. Rather, Schott argues that "a reasonable governmental official in [Schott's] position would not recognize that, by following a mandatory obligation to report abuse, she is violating federal law." Appellant Br. at 39. Schott does not cite any federal case law to support her argument, and instead cites only Ohio's mandatory reporting statutory scheme. Appellant Br. at 37–38. Schott points to the fact that Ohio imposes no good faith requirement on mandatory reporters and provides that they are absolutely immune from civil and criminal liability for those reports. Ohio Rev. Code § 2151.421(G)(1)(a).

As an initial matter, we note that Schott does not take the facts in the light most favorable to the Wenks in framing the clearly-established-law inquiry, as she must do on appeal. *Gaspers*, 648 F.3d at 412. The premise of Schott's argument is that Schott in fact believed herself to be following her mandatory duty to report child abuse under Ohio law when she reported the Wenks to FCCS. However, this argument ignores the factual disputes that the district court found as to whether Schott would have reported the Wenks absent their protected conduct. Reading those disputes in the light most favorable to the Wenks suggests that Schott did not think that the report she made to FCCS was required under Ohio's mandatory reporting law. *Cf. Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 700–02 (6th Cir. 2013) (rejecting the argument by the social worker defendants that a reasonable official in their position would not have realized that the search they performed in a child abuse investigation in a manner allegedly authorized by an Ohio statute violated the Fourth Amendment because there was no

evidence in the record that the social workers actually relied on that law in conducting their search).

A reasonable official in Schott's position would have understood that what she did violated the Wenks' right to be free from retaliation for exercising their First Amendment rights. Our decision in *Jenkins*, decided in 2008, made clear that school officials can be liable if they make reports of child abuse to retaliate against parents for exercising their First Amendment rights. 513 F.3d at 588–89. Although the report in *Jenkins* was false, the heart of a First Amendment retaliation claim, which we have reaffirmed numerous times before 2011, is that "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 *even if the act, when taken for a different reason, would have been proper*." *Bloch*, 156 F.3d at 681–82 (emphasis added). Under this rule, it is clear that the distinction between a completely false report and a partially false report does not matter.

At oral argument, Schott appeared to frame the inquiry slightly differently, asking whether a reasonable school official would think that the immunity conferred under Ohio law for reports of child abuse made in bad faith would prevent liability for violating the Wenks' clearly established right not to be retaliated against for exercising their First Amendment rights. The Supreme Court has long held "that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy, . . . which of course already provides certain immunities for state officials." *Felder v. Casey*, 487 U.S. 131, 139 (1988); *see also Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir. 2000) ("It appears that the district court also applied state statutory immunities for child abuse investigations to the federal constitutional claims and concluded that the City is immune from a § 1983 action under a state immunity statute. Again, the district court erred. Immunity under § 1983 is governed by federal law; state law cannot provide immunity from suit for federal civil rights violations.").

In sum, we hold that the Wenks' right to be free from retaliation for exercising their First Amendment rights was clearly established at the time of this case, and that a reasonable official

in Schott's position would have understood that filing a child abuse report in bad faith violated the Wenks' rights.

## C. Sanctions

The Wenks have filed a motion for damages or, in the alternative, attorney fees and costs, in defending this appeal. The Wenks argue that the appeal is frivolous because Schott makes only factual arguments over which we do not have jurisdiction and raises only new legal arguments on appeal. Schott has responded seeking either a stay of the motion until after our decision, or that we deny the motion.

Under Rule 38 of the Federal Rules of Appellate Procedure, a court of appeals "may . . . award just damages and single or double costs to the appellee" if the court "determines that an appeal is frivolous." Fed. R. App. P. 38. We have set forth the following examples of when it may be appropriate to sanction an appellant: where an "appeal involved an issue already clearly resolved" or "was insubstantial," or the appellant's "arguments essentially had no reasonable expectation of altering the district court's judgment based on law or fact." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 701 (6th Cir. 2003) (internal quotation marks omitted).

Overall, an award of damages or attorney fees and costs is not warranted in this case. It is true that Schott makes some impermissible factual arguments and raises some legal arguments that were not clearly raised below. However, Schott also makes one purely legal argument— whether a reasonable official in Schott's position would understand that she or he was violating federal law in light of Ohio's mandatory reporting laws—that she did raise, albeit briefly, before the district court.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment, and **DECLINE** to impose sanctions on the Appellant.