**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0501n.06

**No. 12-5931**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TANYA MCKINNIE COBB, | ) | **FILED** |
| | ) | *May 20, 2013* |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Western |
| KEYSTONE MEMPHIS, LLC, | ) | District of Tennessee |
| d/b/a Compass Intervention Center, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee. | ) | |

Before:     BOGGS and COLE, Circuit Judges; and QUIST, District Judge.[*]

Boggs, Circuit Judge.  Plaintiff-appellant Tanya Cobb appeals a district-court order granting summary judgment on her Tennessee common-law retaliatory-discharge claim in favor of defendant-appellee Keystone Memphis, LLC d/b/a Compass Intervention Center.  For the reasons that follow, we affirm the district court's order.

**I**

Keystone Memphis, LLC operates the Compass Intervention Center (Compass), a residential treatment facility for at-risk children who suffer from mental, behavioral, and emotional disorders.  Cobb is an African-American female who began working at Compass in 2004 as a Community Counselor.  Cobb was directly supervised by two Community Counselor Coordinators, St. Paul

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

Bourgeois and Sherman Golden. Bourgeois and Golden reported to Jill Clarke, the Director of Nursing, and Clarke reported to Kevin Patton, Compass's CEO. In her role as a Community Counselor, Cobb was responsible for supervising the children assigned to her and was required, *inter alia*, to check on these children every fifteen minutes and document the observations she made during these checks on resident-observation forms. Compass has a clear policy that falsifying resident-observation forms is a ground for termination.

Cobb and another Community Counselor, Lakesha Bishop, were assigned to an overnight shift on September 13-14, 2009. Around 6 a.m. on the morning of September 14, Cobb entered the room of two boys to find them with their genitalia exposed. Bishop brought the two boys to the nurse in charge, Tracey Willis, and reported the incident. The matter was then referred to Director of Risk Management Julia Lowery who conducted an investigation of the incident and, having determined that it was an instance of sexual acting out rather than one of sexual abuse, did not file a report with the Department of Child Services (DCS). During the investigation, Lowery reviewed surveillance tapes, which led her to discover that Cobb and Bishop had failed to perform all of the required fifteen-minute checks on the children under their care. Cobb contests neither that she and Bishop failed to perform all of their required fifteen-minute checks nor that they then falsified resident-observation forms to suggest that they had indeed conducted the requisite checks.

Lowery reported Bishop's and Cobb's actions to Director of Nursing Jill Clarke, and Clarke reviewed the surveillance footage and discussed the infractions with Compass's CEO, Kevin Patton. Compass maintains that Clarke and Patton then made the decision to terminate both Bishop and Cobb on or around September 23, 2009. Compass also asserts that while the decision to fire Cobb

was made contemporaneously with the decision to fire Bishop, Bishop was notified first, on September 29, 2009, because she was the only one of the two available at that time. Cobb, on the other hand, had fallen ill and had not returned to work since the September 14 incident. Pursuant to a doctor's note, she was excused from returning to work until October 6, 2009. Michelle Makepeace-Williams, Director of Compass's Human Resources Department, was asked to review the decision to fire Cobb from a human resources perspective, and she advised Patton that she did not feel comfortable calling Cobb to set up a termination meeting until October 7, 2009, the day after Cobb's doctor's note had expired.

On October 6, however, Bourgeois called Cobb. Bourgeois maintains that he called to set up a meeting between Cobb and her supervisors to discuss her misconduct. He asserts that during this call Cobb brought up Bishop's termination and that Cobb stonewalled him and did not want to meet in person because she knew she was going to be fired. Cobb, on the other hand, claims that Bourgeois called her to ask her to report for work on October 9, 2009. She also claims that once she told Bourgeois that she was planning on reporting the September 14 incident between the two boys to DCS, Bourgeois informed her that she was fired and that she should not come in. Cobb admits, however, that Bourgeois did not have the authority to fire her. *See* Appellant Br. at 15, 28.

Cobb called DCS on October 7, 2009, and reported the September 14 incident. Later that same day, Makepeace-Williams called Cobb as planned to set up a termination meeting. Cobb told Makepeace-Williams that due to another full-time job she held and her son's schedule, she could not meet with her before October 14, 2009. In addition, Cobb claims that during this conversation, she told Makepeace-Williams about her filing a report with DCS. According to Cobb, it was only after

she refused to tell Makepeace-Williams about the details of the report that Makepeace-Williams refused to let her return to work on October 9 and instead forced her to attend the meeting on October 14. On October 14, 2009, Cobb met with Makepeace-Williams, Clarke, and Bourgeois and was told that she was being fired for failing to perform her 15-minute checks and for falsifying documents.

After timely filing a charge with the Equal Employment Opportunity Commission and receiving a right-to-sue letter, Cobb filed a complaint in the United States District Court for the Western District of Tennessee, alleging, *inter alia*, common-law retaliatory discharge in connection with her filing a report with DCS.[1] Compass moved for summary judgment, and the district court granted its motion. The district court first held that, in federal court, the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applied when evaluating a Tennessee common-law retaliatory-discharge claim at the summary-judgment stage. Using this framework, the district court then held that Cobb could not establish the final element of a prima facie case of common-law retaliatory discharge—that her report to DCS played a substantial role in Compass's decision to fire her—because the relevant decision-makers were not aware of Cobb's report at the time that they decided to terminate her. Specifically, it held that the decision to terminate Cobb was made by Clarke and Patton in mid- to late September, well before she filed a report with DCS.

---

[1] While Cobb alleged a number of other grounds for relief, the instant appeal concerns only her common-law retaliatory-discharge claim. *See* Appellant Br. at 6, 17. Cobb's original retaliatory-discharge claim before the district court involved both a claim that she was fired for filing a report with DCS and also that earlier, in March 2009, she was temporarily removed from the work schedule for complaining about several of Compass's workplace practices. Cobb only presses the first of these two claims on direct appeal. *See id*. at 6, 17–18.

Accordingly, the district court granted summary judgment for Compass on that claim. Cobb now appeals.

**II**

As the Tennessee Supreme Court has explained:

By [state] statute, an employer cannot discharge employees because of their race, religion, sex, age, physical condition or mental condition, because they report work place safety violations, because they miss work to perform jury duty, or because they refuse to participate in or be silent about illegal activity at the work place. In addition to the protection afforded by [state] statutes, the Court in *Chism v. Mid–South Milling Co., Inc.* suggested several examples of clearly defined public policies which could warrant the protection provided by an action for retaliatory discharge.

*Anderson v. Standard Register Co.*, 857 S.W.2d 555, 556 (Tenn. 1993) (internal citations omitted), *overruled on other grounds as recognized by Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 79 n.8 (Tenn. 2012). Accordingly, Tennessee courts have recognized a common-law claim of retaliatory discharge for employees who are retaliated against for reporting a "clear violation of some well-defined and established public policy." *Chism v. Mid-S. Milling Co., Inc.*, 762 S.W.2d 552, 556 (Tenn. 1988).

To establish a prima facie case of common-law retaliatory discharge, an employee must show: "(1) that an employment-at-will relationship existed; (2) that the employee was discharged, (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy." *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862

(Tenn. 2002). The Tennessee Supreme Court has held that "[p]roof of a causal link between the employee's exercise of a protected right or compliance with clear public policy and the employer's decision to discharge the employee then 'imposes upon the employer the burden of showing a legitimate, non-pretextual reason for the employee's discharge.'" *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 781 (Tenn. 2010) (quoting *Anderson*, 857 S.W.2d at 559), *superseded by statute as recognized by Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 758 (6th Cir. 2012). Accordingly, the Tennessee state courts have adopted the federal *McDonnell Douglas* framework for analyzing common-law retaliatory-discharge claims, requiring first that a plaintiff establish a prima facie case and then shifting to the defendant the burden of presenting a legitimate non-retaliatory reason for terminating the plaintiff-employee.

In *Gossett*, the Tennessee Supreme Court further held that while the *McDonnell Douglas* framework is applicable during the trial stage of a Tennessee common-law retaliatory-discharge claim, it does not apply at the summary-judgment phase. *Id*. at 785–86. Rather, once an employee establishes a prima facie case of retaliatory discharge, an employer, to obtain summary judgment, must "produce evidence or refer to evidence in the record that affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." *Id*. at 782 (internal quotation marks omitted).

The parties in this case dispute whether federal courts, sitting in diversity, are bound to apply the summary-judgment standard announced in *Gossett* rather than the standard provided by the *McDonnell Douglas* framework. Ultimately, however, we need not assess *Gossett*'s applicability

to federal courts, as Compass's motion for summary judgment prevails under either the *Gossett* or *McDonnell Douglas* framework.

## III

## A

Before proceeding, it is worth mentioning what *Gossett*'s holding *did not* alter about the summary-judgment phase for common-law retaliatory-discharge claims. Under both *Gossett* and *McDonnell Douglas*, the plaintiff employee still must establish a prima facie case. The two frameworks differ only as to what evidence a defendant employer must then produce in order to rebut the prima facie case. Under *McDonnell Douglas*, evidence of a legitimate non-discriminatory reason will suffice, while *Gossett* requires evidence that actually negates an element of the prima facie case.

Cobb argues that "[p]ursuant to *Gossett*, a plaintiff requires *no proof* to survive summary judgment unless the defendant moving for summary judgment first shows there is no genuine issue as to any material fact on an essential element." Appellant Br. at 24–25 (emphasis added). Apparently, Cobb believes that to prevail on a motion for summary judgment under *Gossett*, Compass must affirmatively negate a required element of her retaliatory-discharge claim even if she has not pled any facts sufficient to establish a prima facie case. This is a misreading of *Gossett* and an untenable view of pretrial practice and procedure. The idea that a plaintiff could survive a motion for summary judgment without having pled any facts to support the elements of her claim is contrary to the most basic rules of the American legal system and, more specifically, Tennessee state procedure. *See* Tenn. R. Civ. P. 8.01 ("A pleading which sets forth a claim for relief . . . shall contain [] a short and plain statement of the claim showing that the pleader is entitled to relief . . . .");

*see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (alteration in original) (internal citations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007))).

While it is true that *Gossett* contained language stating that "[a] plaintiff requires no proof to survive summary judgment unless the defendant moving for summary judgment first shows there is no genuine issue as to any material fact on an essential element," *Gossett*, 320 S.W.3d at 785–86, this statement clearly presumed that a plaintiff had first established a prima facie case and merely emphasized that a plaintiff need not take any *further* action unless the defendant could affirmatively negate an element of the already established prima facie case. As *Gossett* itself explained, to prevail on summary judgment, the moving party "must point to evidence that tends to disprove a material factual allegation *made by the nonmoving party*." *Id*. at 782 (emphasis added) (internal quotation marks omitted). Thus, the non-moving party clearly is required to present material factual allegations at the outset to establish its prima facie case. The only change *Gossett* wrought was to alter the employer's burden once the prima facie case was established.

**B**

Assessing Cobb's claim under either *Gossett* or *McDonnell Douglas*, it is readily apparent that her claim cannot survive Compass's motion for summary judgment. As the district court appropriately found, Cobb has failed to produce evidence to establish the fourth element of common-law retaliatory discharge—that her report to DCS was a substantial factor in Compass's decision to

discharge her. Compass maintains that Patton and Clarke made the decision to fire Cobb in mid-to late September—at the same time as Bishop's termination and well before Cobb made her report to DCS. If these facts are taken as true, the decision to terminate Cobb, made long before she had contacted DCS, could not have been causally related to her report to DCS. Accordingly, the critical question on appeal is whether the decision to fire Cobb was made before or after the decision-makers at Compass had learned of her report to DCS. Whether operating under the direction of *Gossett* or *McDonnell Douglas*, Cobb initially must present evidence to support this fourth element of her prima facie case. Viewing the evidence in the light most favorable to Cobb, she has failed to carry this burden.

**1**

Cobb relies on two alleged incidents to establish that her report to DCS was a substantial factor in her termination: (1) her October 6 conversation with Bourgeois and his placing her on a work chart; and (2) her October 7 conversation with Makepeace-Williams. With regard to the first alleged incident, even accepting Cobb's version of her conversation with Bourgeois, she has not produced evidence to dispute the fact that the decision to fire her was made much earlier by Patton and Clarke. Assuming, as we must, that Bourgeois's telling Cobb that she was fired occurred only after Cobb revealed her intention to file a report with DCS, this reaction is of no import, as Cobb admits that Bourgeois had no authority to fire her. *See* Appellant Br. at 15, 28. Logically speaking, the offhand comment of an individual who had no input into hiring and firing decisions does nothing to inform our inquiry into when or why the actual decision-maker fired an employee. *See Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) ("[T]he discriminatory or retaliatory animus of

a coworker is not usually relevant to whether the employer [retaliated]. Rather, the relevant beliefs or motivations are those of the actual decisionmaker . . . ."); *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (holding that when an individual is not "a decision-maker in connection with the discharges[,] . . . whatever statements he made are irrelevant"); *Geiger v. Tower Auto.*, 579 F.3d 614, 620–21 (6th Cir. 2009) (noting that "discriminatory statements must come from decisionmakers to constitute evidence of discrimination"). Even if Bourgeois did respond negatively to Cobb's intending to file a DCS report and wished that he himself could fire her for such an action, his personal reaction sheds no light on whether the real decision-makers at Compass, Patton and Clarke, acted for the same reasons. Thus, Bourgeois's alleged statement does not establish any kind of causal connection between Cobb's filing of a report and Compass's actual decision to discharge her. Furthermore, Bourgeois's alleged comment that Cobb was fired is perfectly consistent with Compass's assertion that the decision to fire Cobb had already been made by Patton and Clarke.

Also related to Cobb's conversation with Bourgeois is her claim that Bourgeois had placed her on the work chart and told her to come in to work. Cobb argues that her being listed on this chart as working on October 9 indicates that she had not been fired as of that date. We first note that even if an employee is scheduled to work, this does not preclude the possibility that a decision has already been made to fire that employee in the near future. Employers often continue to employ individuals, sometimes for reasonably long periods of time, with the intention of ultimately firing them. Accordingly, Bourgeois's placing Cobb on the work schedule for October 9 and his alleged statement asking her to come in to work do not indicate one way or the other whether the decision-

makers at Compass had already made the decision to fire Cobb earlier in September and well before her report to DCS.

In addition, it is uncontested that Bourgeois alone created the work schedule, and that, as mentioned above, he was not involved in the decision to fire Cobb. Thus, Bourgeois's placing Cobb on the work schedule does not indicate that the real decision-makers within Compass had not already made the decision to terminate Cobb, especially since Bourgeois stated in his deposition that he created the schedule in mid-September before being notified of Patton and Clarke's decision to fire Cobb.

Cobb points out that Bishop, who was also fired for failing to conduct fifteen-minute checks during her September 13-14 shift, was not placed on the work schedule, arguing that this omission refutes Compass's claim that the decisions to fire Cobb and Bishop were made contemporaneously. Yet, as Compass points out, it is uncontested that Bishop was immediately notified of her termination, thus her removal and Cobb's non-removal are perfectly consistent. In fact, Bishop's September 29 termination—for misconduct identical to Cobb's that was jointly committed by the two of them during the same incident—strongly suggests that Compass's decision to discharge Cobb was also made in mid- to late September. Cobb's reliance on the time line of Bishop's firing ignores the fact that had Cobb not been out on sick leave, there is no reason to believe that she would not have been fired at the same time as Bishop.

**2**

Next, Cobb turns to her alleged conversation with Makepeace-Williams on October 7. Cobb argues, as she did before the district court, that this conversation establishes the fourth element of

a prima facie case of retaliatory discharge.[2] This argument founders for the same reason that Cobb's reliance on Bourgeois's comment failed—Makepeace-Williams was not a decision-maker. Compass has submitted evidence indicating that Patton and Clarke made the decision to terminate Cobb and that Makepeace-Williams had no such decision-making power. Compass asserts that Makepeace-Williams's only involvement was to review Patton and Clarke's decision from a human-resources perspective and then contact Cobb to schedule a meeting. If this is indeed true, the statements that Makepeace-Williams allegedly made to Cobb do not bear on when and why the real decision to fire Cobb was made.

Cobb contests Compass's assertion that Makepeace-Williams was not a decision-maker, making the conclusory statement that "the proof shows that Michelle-Makepeace Williams [sic] was a decision-maker with respect to the termination of Ms. Cobb who specifically informed the [sic] Ms. Cobb that she would not be terminated if provided information concerning her report of abuse to the State on October 7, 2009." Appellant Br. at 30. But Cobb points to no evidence in the record, or anywhere else for that matter, contradicting Compass's assertion that Makepeace-Williams had no authority to fire Cobb. Rather, Cobb simply relies on her own speculative belief that because Makepeace-Williams allegedly told Cobb she was fired, she must have been the one who made that

---

[2] For the first time on appeal, Cobb also argues that this conversation constitutes *direct* evidence of retaliatory discharge and can suffice to prove her claim without reliance on the four-element prima-facie-case framework employed when only circumstantial evidence is available. Having failed to present this argument before the district court, it is waived. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996).

decision. According to Cobb, this creates a genuine dispute of material fact as to whether Makepeace-Williams was a decision-maker.

Cobb fundamentally misunderstands what constitutes a *genuine* dispute of material fact, essentially arguing that if she contests a fact in her brief, no matter how unfounded her objection, her claim survives summary judgment. This is not the case. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing [a motion for summary judgment] may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." (internal quotation marks omitted)); *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Simply speculating that Makepeace-Williams was a decision-maker—without any further proof and in the face of Compass's affirmative evidence to the contrary—does not create a *genuine* dispute for the purposes of summary judgment. Accordingly, Cobb cannot dispute that Makepeace-Williams was a non-decision-maker, and Makepeace-Williams's statement therefore cannot dispute Compass's evidence that the true decision to fire Cobb was made by Patton and Clarke well before Cobb filed her report with DCS.

**C**

In sum, neither Cobb's interactions with Bourgeois nor her conversation with Makepeace-Williams establish a causal connection between her report to DCS and her termination. Cobb has

thus failed to establish the fourth element of a prima facie case of common-law retaliatory discharge

and cannot survive summary judgment under either the *Gossett* or *McDonnell Douglas* standard.

## IV

For the foregoing reasons, we AFFIRM the order of the district court.