NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0275n.06

No. 18-5671

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| M.L.; J.L., | ) | **FILED** |
| | ) | May 24, 2019 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| WILLIAMSON COUNTY BOARD OF | ) | THE MIDDLE DISTRICT OF |
| EDUCATION, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. In the 2015–16 school year, teachers at an elementary school in Tennessee made three reports of suspected child abuse regarding a second-grade student with a disability. Each time, the Tennessee Department of Children's Services (DCS) either declined to investigate or found no indication of abuse. The child's parents later sued the school board, claiming that the teachers had made these reports in retaliation for the parents having advocated for special education services for their son. Following discovery, the district court granted summary judgment in the school board's favor. We AFFIRM.

I.

M.L. and J.L. are the parents of J, a child diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiance Disorder. Among other symptoms, J exhibits impulsive

behavior, hyperactivity, and hypersexuality. During the events in question, J was around seven years old and attended Kenrose Elementary School in Tennessee.

The relevant events, which we recount in the light most favorable to the plaintiffs, began in the spring of 2015. In April, J's mother, M.L., called an individualized education program (IEP) meeting to discuss an incident at school in which J was left alone in a "seclusion room" for over four hours without parental notification. When M.L. went to the room at the end of the school day to pick up J, she found him naked, on the floor in a fetal position, and surrounded by urine. During the meeting, the school psychologist, Diana Briley, became irritated, telling M.L. that school personnel were professionals and that they did not appreciate M.L. calling IEP meetings.

The next day, M.L. sent an email to Briley and the school's principal, Dr. Marilyn Webb, among others, complaining that Briley had acted unprofessionally. Dr. Webb responded that the Kenrose staff was happy to meet with M.L. whenever she requested a meeting. But Dr. Webb also wrote that she "would be happy to meet with [M.L.] and talk about the feelings of our staff, communicated by Ms. Briley and shared by others." In May, during another IEP meeting, M.L. overheard Dr. Webb state with annoyance that the school had needed to create a seclusion room because of J. During that same month, the school agreed to update J's Behavioral Intervention Plan (BIP), which M.L. had been advocating for throughout the 2014–15 school year. The 2014–15 school year ended without further incident.

At the beginning of the 2015–16 school year, J displayed some troubling behavior. In September 2015, J's second-grade teacher, Allyson Whitley, observed J grab his best friend around the waist and thrust his pelvic area into the other boy's bottom. Whitley reported the incident to Carrie Glover, J's special education teacher, who claims she then called M.L. to discuss J's

behavior. But M.L. denies being informed of this incident at that point. Neither Whitley nor Glover took any further action at that time.

The parents continued to advocate for J. In September, M.L. again requested that J's BIP be updated; the school had not updated the BIP despite having agreed to do so in May 2015. In early November 2015, M.L. attended an IEP meeting where the attendees discussed a written complaint J's parents had prepared regarding J's education. The parents contended that the lack of an effective BIP was contributing to J's behavioral problems; they expressed concern over the frequency and effectiveness of putting J in seclusion; and they worried the school was "hyper-focused on him and waiting for him to misbehave." In response, behavioral specialist, Lindsay Naylor, said that the school's staff members "did so much" for J and that M.L. "did not appreciate them." That same month, the school implemented the updated BIP, the delay apparently resulting from the departure of the behavioral analyst tasked with the update.

Four days after the contentious November meeting, a special education teacher's assistant, Pam Callaway, told DCS that she suspected J was being abused. Callaway reported the following: that morning, J had been "teary and emotional"; he told her that his father, J.L., had hurt J and his brother, R, by twisting their arms and pinching their noses, and J demonstrated by putting an arm around his neck in a choking position; J had some bruises on his legs at this time; Callaway asked whether J.L. had been playing with J, and J responded that he was "a little afraid." Callaway also reported that J said that J.L. was mad at him and his brother for taking "naked pictures" of each other and of J.L. and that they made a "naked room" to hang the pictures. DCS investigated but ultimately concluded that J.L. had just been playing with the boys.

In January 2016, Glover, Whitley, and M.L. attended an IEP meeting where M.L. requested extended school year services for J during the summer; but the teachers thought that home visits and letters would be better.  M.L. responded that these recommendations were "great."

In March 2016, the same student whom J had touched in the September incident was bending over to tie his shoes when J grabbed him by the waist and slapped him on the bottom several times.  J then followed the boy into an individual bathroom but exited when a staff member quickly opened the door.  That same day, J told Whitley that his father, J.L., was "in trouble for spanking him, pulling his hair, and pulling his nose."

Whitley discussed both the inappropriate touching and J's new allegations of physical abuse with Glover.  The next day, Glover and Whitley made a report to DCS.  They described J's slapping his friend's bottom and following him into a bathroom and relayed J's recent allegations of physical abuse.  They also reported that:  J.L. travels often for work, and J is "clingy" with school staff when J.L. is home; J comes to school with marks and bruises on his legs; J had previously written in his journal that he was scared of J.L.; M.L. was likely aware that physical abuse was occurring; J was immature for his age; and that J and his younger sibling, N, sometimes sleep in the same bed but that M.L. removes N when she goes to bed.  Glover and Whitley also described the September 2015 incident when J grabbed his friend around the waist and thrust his pelvic area into the other boy's bottom.  DCS screened the case out, apparently concluding that the allegations, which included "the 'pinching of the nose,'" had been previously investigated.

J continued to demonstrate potentially troubling behavior.  In May 2016, the student involved in the September and March incidents was lying on a rug preparing to watch a movie when J crawled on top of him and repeatedly pressed his face into the boy's bottom.  Glover consulted Lindsay Naylor, the school's behavioral specialist, about this incident.  Naylor agreed

that J's behavior warranted a report, and Glover made a report to DCS the next day. In addition to relaying the previous day's event, Glover reported that: M.L. had stated that J "may be acting out with [his brother] at home" and that she is uncomfortable leaving J alone with his younger brother, N; if J and his brother were in the same bed, M.L. would remove the brother; "[t]here are strange things" between M.L. and J.L.; all the children sleep in M.L.'s bed, while J.L. sleeps in the basement; M.L. had expressed concerns about J's uncle, who may have a substance abuse problem and who "did not speak much"; and that J.L. travels frequently for work and J is "clingy" at school when J.L. is at home. Finally, Glover again referenced both the September incident, when J had thrust his pelvic area into another boy's bottom, and the March incident, when J had grabbed the same boy by the waist and smacked his bottom.

DCS investigated. During the investigation, J disclosed some inappropriate behavior between him and his younger brother, N. A DCS investigator recommended that M.L. take steps to monitor J and N more closely, including putting a bell on J's door so J's parents could hear if he got up in the middle of the night. But DCS ultimately concluded that J "did not disclose anything" and closed the case. Regarding the most recent incident of alleged sexual behavior at school, DCS concluded "[t]he children were watching a movie in class and [J] put his head on his best friend's butt like it was a pillow."

At the end of the 2015–16 school year, J's parents moved him to another school. They later sued the Williamson County Board of Education, alleging that the school's three reports of abuse had been made in retaliation for their advocacy for J, in violation of: (1) § 504 of the Rehabilitation Act, 29 U.S.C. § 794; (2) Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203; and (3) the First Amendment and 42 U.S.C. § 1983. In June 2018, the district court granted summary judgment in the Board's favor on all claims. The parents now appeal.

II.

This appeal came to us on the district court's grant of summary judgment. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, courts "consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). A grant of summary judgment "should be reversed if there is a genuine need for trial, which turns on whether the evidence is such that a reasonable jury could return a verdict for [the non-moving party]." *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696 (6th Cir. 2013) (internal quotation marks omitted). This court reviews a district court's grant of summary judgment de novo. *Id.*

A. The § 504 and Title II Retaliation Claims

We may address the parents' retaliation claims under § 504 of the Rehabilitation Act and Title II of the ADA together. "The Acts have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both." *Id.* at 696–97. Because the parents present no direct evidence of retaliation, we analyze the claims under the *McDonnell Douglas* burden-shifting framework. *Id.* at 697; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To state a prima facie case under either § 504 or Title II of the ADA, the parents must show: (1) they engaged in protected activity; (2) the Board knew of the protected activity; (3) the Board took an adverse action against them; and (4) there was a causal connection between the protected activity and the adverse action. *A.C.*, 711 F.3d at 697. If the parents make out a prima facie case, the Board would carry the burden to show "that it had a legitimate, non-discriminatory"

reason for its actions. *Id.* Once having done so, the parents would bear the burden to "prove by a preponderance of the evidence that the legitimate reasons offered by [the Board] were not its true reasons, but were a pretext for retaliation." *Id.* (internal quotation marks omitted).

### 1. The November 2015 Report

The parents' claim regarding the November 2015 report fails at the prima facie stage. Advocating for accommodations under the disability laws is protected activity. *Id.* at 698. And we have previously held that making a false report of suspected child abuse is an adverse action under these statutes. *Id.* But, though the burden at the prima facie case stage is "not onerous," *id.* at 697, the parents cannot succeed even under this lenient standard because they have produced no evidence of a causal connection between the November report and any protected activity; indeed, they have failed to show that the reporter, Pam Callaway, even knew of any protected activity.

The November report occurred shortly after the contentious November IEP meeting, one topic of which was the parents' written complaint. But Callaway did not attend this meeting. And the parents admit that Callaway did not attend other IEP meetings, nor was she otherwise involved in deciding what services would be provided to J. Indeed, the parents provide no evidence that they interacted with Callaway at all. They argue only that, although Callaway did not attend the IEP meetings, she worked closely with teachers who did. This is not enough to show that Callaway was even aware of the parents' complaints, let alone that she acted in retaliation for them. Given the dearth of evidence here, no reasonable jury could return a verdict for the parents as to the November 2015 report.

### 2. The March and May 2016 Reports

We may assume that the parents have stated a prima facie case of retaliation as to the March and May reports; but even making that assumption, the parents' claims fail because they have not

adequately shown pretext. The Board has satisfied its burden of putting forth a legitimate, nondiscriminatory reason for the March and May reports—the teachers' duty to report suspected child abuse pursuant to Tennessee law.[1] The parents, therefore, must show pretext to survive summary judgment. The same evidence can support both a finding of causation for the plaintiff's prima facie case of retaliation and a finding of pretext. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 107 (6th Cir. 2005).

On appeal, the parents do not marshal their evidence toward specific methods of showing pretext, though there are three. We therefore look at the entirety of their evidence to determine whether it shows that the Board's claim that it made the reports to comply with its legal duty to report suspected abuse: (1) lacks a basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *See Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007).

*No basis in fact?* The first method of proving pretext "consists of evidence that the proffered bases for the [adverse action] never happened, *i.e.*, that they are factually false." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004) (citation omitted). The parents do not dispute that the events leading Glover and Whitley to make the March and May reports actually happened. Two serious incidents occurred the day before the teachers made the March report. First, J again touched his friend inappropriately. Second, J told Glover that his father was "in trouble" for spanking him and pulling his hair. Although the parents claim that J "had simply playfully hit his friend's bottom and then hugged him from behind," they did not witness the event

---

[1] Tennessee law requires any person with knowledge of harm that reasonably appears to have been caused by abuse or neglect to report such harm immediately. Tenn. Code Ann. § 37-1-403. Knowingly failing to make a required report is a misdemeanor, Tenn. Code Ann. § 37-1-412(a), and may also give rise to civil liability, *see Ham v. Hosp. of Morristown*, *Inc.*, 917 F. Supp. 531, 535 (E.D. Tenn. 1995).

and no percipient witness disputes the teachers' description. In any event, the parents admit that J hit his friend's bottom. And the parents never claim that the teachers made up J's statements about his father physically hurting him. In May, J crawled on top of the same boy he had touched in September and March and repeatedly pressed his face into the boy's bottom. Although the DCS report concluded that J had "put his head on his best friend's butt like it was a pillow," the report still concludes that this touching happened. The parents have thus failed to show that the proffered reason for making the March and May reports lacked a basis in fact.

The parents lean heavily on the fact that DCS declined to investigate the March report and made no finding of abuse when it investigated the May report, instead concluding that "[t]here are no concerns at this time." This is surely a necessary component of the parents' case—if DCS had substantiated the reports of abuse, the parents could hardly claim a lack of reasonable suspicion triggering the duty to report. But it is not alone sufficient. Some legitimate suspicions of child abuse will ultimately prove unfounded, which is why DCS conducts investigations, rather than simply deeming all reports to be true. But just because a report ultimately proves false does not mean that the concerns motivating the report were fictitious. To show a "lack of basis in fact," the parents would need more than DCS's conclusion that no abuse had occurred.

*Insufficient to Motivate?* The parents next claim that the duty to report was "insufficient to motivate" the March and May reports. Proving pretext by this method typically consists of "evidence that other[s] . . . were not [reported] even though they engaged in substantially identical conduct to that which the [defendant] contends motivated its [report] of the plaintiff." *Id.* (citation omitted). The parents offer no comparator evidence. Instead, they claim that J's actions were insufficient to trigger the teachers' duty to report suspected abuse in March because J was not acting in a sexual way, but rather "had simply playfully hit his friend's bottom and then hugged

him from behind." But, as discussed above, the parents provide no evidence from which a reasonable jury could conclude that this is what happened. And while we are required to construe the facts in the light most favorable to the parents, the parents cannot create a genuine dispute of a material fact by making unsupported allegations. *See Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013). Neither parent witnessed the event, and no percipient witness contradicts the teachers' characterization. The parents cite notes written by J's psychiatrist, Dr. Susanna Quasem, as putative support. But these notes reflect only how M.L. described the event to Dr. Quasem. These same notes, moreover, state that J "made some movements that appeared sexual in nature to the teacher."

As to the May report, the parents again claim that, because DCS concluded that there had been no abuse, reasonable suspicion of abuse could not have motivated the report. We have previously explained why this analysis is faulty. It is true that J's board-certified behavior analyst, Julie Mayer, who is also a mandatory reporter of child abuse, stated that the events surrounding the May report "in no way warrant that response." But, as with Dr. Quasem's notes above, Mayer's response was based only on M.L.'s description of J's behavior, which she did not see, and which did not include, for example, the fact that J had followed his friend into the bathroom or that J had again complained of physical abuse.

The parents next argue that J's actions were insufficient to motivate either report of child abuse because school staff knew that J's problems interacting appropriately with his classmates were a result of his disabilities. As evidence, they point to a "manifestation determination" signed by school staff. In late February 2016, J had been suspended from school after he lunged at a classmate and punched her with both fists. M.L. asked a psychologist to attend the resulting IEP meeting, and the psychologist explained that J struggled with impulsivity and social immaturity.

At the end of the meeting, the participants, including Glover and Whitley, collectively checked "Yes" in response to the question "Was the behavior caused by, or did it have a DIRECT and substantial relationship to the student's disability?" The parents place great weight on this document, claiming that it shows that it was "clearly determined that J's acting out toward classmates was caused by his disability." But, though we take the evidence in the light most favorable to the parents, this evidence is insufficient to demonstrate pretext. The document establishes only that Glover and Whitley agreed that that one incident—in which J punched his classmate—was a result of his disabilities, not that every future inappropriate interaction, whatever its character, would inevitably result from his disabilities. Here, the punching incident was different in kind from the behavior that immediately preceded the reports; there were no sexual overtones. And even if school staff had been aware that J's hypersexual behavior could result from his disabilities, such awareness would not negate the possibility that J was *also* being sexually abused and exposed to the behaviors he was later acting out. Finally, this argument entirely ignores the second principal basis for making the March report—J's renewed allegations of physical abuse.

*Did not actually motivate?* The parents are left to argue that the proffered reason did not actually motivate the reports. To prove pretext by this method, "the plaintiff admits the factual basis underlying the . . . proffered explanation and further admits that such conduct could motivate [a report]" but "argues that the sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the [Board's] explanation is a pretext, or a coverup." *Hedrick*, 355 F.3d at 460. In other words, under this method, the plaintiffs must admit (for arguments' sake) that the events occurred as the teachers described them and also that such conduct could trigger the teachers' mandatory duty to report. The parents must then produce sufficient evidence from which a jury could conclude that, despite these admissions, the Board is using the duty to report

as a coverup for its true motivation: to retaliate. This method of proving pretext is a tough climb for the parents who, having admitted the facts arguendo, must show that teachers facing criminal and civil penalties for failure to report signs of abuse would nevertheless have kept mum, were it not for their desire to retaliate.

The parents suggest that if Glover had been serious about her duties as a mandatory reporter, she would have immediately reported the September incident (when J thrust his pelvic area into his friend's bottom), instead of waiting six months to include it in the March report. But as Glover clarified, it was the pattern of sexually inappropriate behavior that concerned her.

The parents next suggest that a reasonable jury could conclude that the school would not have complied with its duty to report, but for its desire to retaliate, because the staff had demonstrated hostility toward the parents and their desire to obtain appropriate services for their son. The facts in the light most favorable to the parents do suggest that in April 2015, roughly a year before these reports, "others" on the school staff had "shared" Briley's displeasure about M.L. calling IEP meetings. But there is no evidence that Glover or Whitley in particular shared Briley's feelings, even at that time; nor is there any evidence of hostility between the parents and Glover or Whitley. To the contrary, the uncontradicted evidence suggests that M.L. had a good relationship with the teachers. M.L. wrote glowing emails expressing appreciation for Glover and Whitley in September 2015, December 2015, and March 2016. In her March email, for example, M.L. wrote that "[w]e are so blessed to have such caring, patient, talented and loving people helping [J] and taking care of him at school. Thank you all for EVERYTHING you do for [J]."

The parents attempt to characterize the teachers' rejection of M.L.'s request for extended school year services as a source of tension, but no evidence supports that allegation. When the teachers proposed alternative services instead, M.L. responded that these recommendations were

"great." And though M.L. later renewed her request for extended school year services, she did not do so until after Glover had made the May report to DCS.

The parents do advance some evidence suggesting displeasure by Naylor, the behavioral specialist whom Glover consulted before making the May report. In November 2015, Naylor had remarked to M.L. that school staff "did so much" for J and that M.L. "did not appreciate them." But this evidence is insufficient to create a genuine dispute of material fact. Even in the light most favorable to the parents, there is no further evidence of hostility to suggest this was anything more than a one-off comment, made six months before the report at issue. And Naylor did not even make the May report; Glover merely consulted with her before Glover made the report.

The parents argued, and the district court agreed, that the reports contained irrelevant personal allegations. While including "irrelevant personal allegations" against parents can be evidence of retaliation, *Wenk v. O'Reilly*, 783 F.3d 585, 596 (6th Cir. 2015), the information provided in the report here is not obviously irrelevant to suspected sexual abuse. We cannot say that children's sleeping arrangements, the parents' sleeping arrangement, the parents' relationship with each other, and relatives with potential substance abuse issues are categorically irrelevant considerations when trying to figure out whether a child is being sexually abused.

Finally, the parents claim that the reports' timing is suspicious. The parents argue that both reports occurred "within weeks" of IEP meetings. This statement is true, in that four weeks separated the March 3 IEP meeting and the March 31 report, and two-and-a-half weeks separated the April 26 meeting and the May 13 report. But these facts alone are insufficient to support an inference of retaliation. The school held eight IEP meetings for J throughout the school year, such that nearly any report would have followed "within weeks" of a meeting. And the parents have

produced no evidence of hostility, disagreement, or other red flags during either the March 3 or April 26 meetings that could give rise to an inference of retaliatory intent.

In sum, the parents have failed to produce evidence from which a reasonable jury could conclude that a legal duty to report suspected abuse did not actually motivate the report and that retaliation did. Having failed to produce a jury-submissible case of pretext under any recognized method, the parents' claims with respect to the March and May reports cannot proceed. Because the parents have failed to show pretext, we need not address the parties' arguments regarding the honest belief rule, as that rule comes into play only when a party has made a showing of pretext. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007).

### B. The First Amendment Retaliation Claim

There remains the parents' charge of First Amendment retaliation under § 1983. The parents have sued only the Williamson County Board of Education, not any individual. Because there is no respondeat superior liability in a § 1983 claim, the Board is liable only if the Board *itself* caused the parent's harm through an official policy or custom. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010).

The district court did not discuss policy or custom in granting the Board's motion for summary judgment. But the parents cannot claim that this argument took them by surprise. The Board expressly argued this point in its summary judgment motion. And we may affirm a district court's grant of summary judgment "on any grounds supported by the record, even if they are different from those relied upon by the district court." *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 655 (6th Cir. 2000). The parents offer no evidence of a policy or custom that led to their injury. In their briefing, they claim only that the Board "has gone to great pains to claim that it was its policy and practice to report *all* 'known signs of abuse,' without taking into account any

context." But even if this were the Board's policy, the parents have the policy's implications backwards. Requiring teachers to report any observed signs of abuse—even those a teacher would subjectively discount if permitted to consider context—denies teachers discretion, and hence their ability to retaliate.

Perhaps recognizing this flaw, the parents made an about-face following oral argument. In a Federal Rule of Appellate Procedure 28(j) letter, the parents argued that the Board "may be found to have an undefined practice of educators reporting to DCS . . . without defined parameters . . . and that complete discretion is given without parameters." This belated argument lacks support in the record and cannot save the claim. Without any evidence demonstrating whether the Board had a policy, or what its contours were, the parents have failed to show that any policy or custom caused retaliation for protected speech. We thus agree with the district court that summary judgment is appropriate for this claim.

\* \* \*

We AFFIRM the district court's grant of summary judgment in favor of the Board.